### HARGREAVES v. UNITED STATES. *
### No. 7593.

Circuit Court of Appeals, Ninth Circuit.
Jan. 21, 1935.

*Rehearing denied March 25, 1935.

Wm. H. Neblett, H. H. MacDonald, and Harry W. Dudley, all of Los Angeles, Cal., for appellant.

Peirson M. Hall, U. S. Atty., and Robert W. Daniels, Asst. U. S. Atty., both of Los Angeles, Cal., and J. Albert Woll and Guy K. Bard, Sp. Assts. to Atty. Gen.

Before WILBUR and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge.

This case is before the court on an appeal by the defendant, Richard L. Hargreaves, from the judgment and sentence of the District Court on verdict of the jury finding said defendant guilty of violating section 5209, R. S., as amended (12 USCA § 592).

Richard L. Hargreaves and John R. Scantlin were president and vice president of the First National Bank of Beverly Hills. Hargreaves became president in 1927; Scantlin came to the bank as vice president in 1928. They continued in these offices until the bank closed in June, 1932. Hargreaves and Scantlin were the executive and managing officers of the bank, and both of them were on the board of directors and also on the executive committee, to which most of the powers of the board of directors were delegated, including that of approving loans. On August 2, 1933, the federal grand jury at Los Angeles returned a secret indictment against Richard L. Hargreaves and John R. Scantlin. This indictment contained two counts; the first for misapplication of funds in the sum of $25,000, and the second for the abstraction of stock claimed to belong to the bank. At the time of the

trial, on motion of the government counsel, the second count of this indictment was dismissed.

On December 20, 1933, the grand jury returned another indictment charging Hargreaves and Scantlin in three counts with misapplication of the funds of the bank with intent to injure and defraud the bank and, in fourteen counts charging them with knowingly, willfully, and unlawfully making false entries in the reports to the Comptroller of the Currency with intent to deceive the other officers of the bank and the Comptroller of the Currency.

The two indictments were consolidated for trial. The defendant Scantlin entered a plea of nolo contendere which was accepted; defendant Hargreaves was tried alone. There were nineteen counts in the consolidated indictments. The court, at various stages of the trial, dismissed five counts. The jury disagreed on five counts and found defendant Hargreaves not guilty on one count, and returned a verdict of guilty on eight, counts 1, 3, 4, 5, 6, 9, 10, 11, 14, and 15.

When called for sentence, defendant moved for a new trial. The court set aside the verdict of the jury on counts 5 and 10 of the second indictment and sentenced Hargreaves to imprisonment for a period of three years on each of the remaining counts, 1, 3, 4, 6, 9, 11, 14, and 15, the periods of imprisonment to begin and run concurrently.

Only a statement of those counts on which the defendant was sentenced will be given here. The first count on which the defendant was found guilty was for the misapplication of $12,000 of the bank's money, which Hargreaves borrowed from the First National Bank of Beverly Hills on January 30, 1931. The loan was arranged through Mr. Bell of the Bank of America in Los Angeles, who procured one B. H. Brown, a vice president of said bank, to sign the note as an accommodation maker. The note was made to the First National Bank of Beverly Hills, of which the Bank of America was a correspondent, and at times had considerable of its money on deposit. The Bank of America issued a cashier's check for that amount payable to Brown, who was immediately asked to and did indorse the check to Hargreaves. The Bank of America charged the $12,000 against the deposit of the First National Bank of Beverly Hills. Brown received no consideration whatever for signing the note; he was merely a dummy in the transaction. The testimony shows that the First National Bank of Beverly

Hills received the Brown note from the Bank of America and paid to said bank $12,-000. The cashier's check for $12,000 which had been issued and indorsed by Brown was indorsed by Hargreaves and deposited to his personal credit in the First National Bank of Beverly Hills. The money was later checked out by Hargreaves and the funds withdrawn from the custody of the bank. The Brown note for $12,000 was charged off by the First National Bank of Beverly Hills as a loss on April 15, 1932. The date of the note appearing thereon was January 29, 1931. The note register of the bank does not show any guarantee by the defendant on or about January 29, 1931, when the note was executed, but the renewal note of B. H. Brown, dated August 7, 1931, was guaranteed by Hargreaves as of that date. However, the evidence shows that then the financial responsibility of Hargreaves was such that the guarantee was of no value. Brown testified that no one asked him whether he was worth the amount of the note or not, and further testified that it was a question whether he was worth it unsecured; that he never expected to pay it; and that he subsequently went into bankruptcy.

The third count charged Hargreaves with misapplying the sum of $1,000 of the bank's money, on account of a note of his own discounted at the bank on August 4, 1931. The amount of money was subsequently withdrawn from the control of the bank. At the time, Mr. Hargreaves had a very small commercial account with the bank and had drawn his salary in advance.

The fourth, sixth, ninth, and eleventh counts charged defendant with making entries in reports to the Comptroller of the Currency, which concealed from the other directors of the bank and from the Comptroller of the Currency the true condition of the bank concerning the liability of Hargreaves and Scantlin to the bank. The evidence shows that Hargreaves and Scantlin had employees of the bank and others execute notes for which the makers received no consideration, and in connection with which these signers were acting merely as dummies for the accommodation of Hargreaves and Scantlin; that upon these dummy notes the bank's money was advanced which was used to purchase stock for Hargreaves and Scantlin, or for purposes other than for the benefit of the bank. The makers of these notes did not expect to pay them; the debt to the bank was the obligation of Hargreaves and Scantlin. Neither the books of the bank

nor the reports to the Comptroller revealed the true state of these transactions. Cravens v. U. S., 62 F.(2d) 261, 282 (C. C. A. 8).

Counts 14 and 15 showed false entries in two different reports to the Comptroller of the Currency in failing to disclose the ownership by the bank of 500 shares of Barnsdall Oil Company stock. It is argued on behalf of the appellant that the offenses stated in counts 4, 6, 9, 11, 14, and 15, charging false entries in reports to the Comptroller of the Currency, were barred by the statute of limitations; that the offenses, if any, were committed at the time the original entries were made in the books of the bank; that a report to the Comptroller of the Currency reflecting the conditions as actually appearing on the books did not constitute an offense; that if an offense was committed thereby, it should be held to have been committed as of the date of the entries in the books of the bank and not the date of the report.

█ The charge and the proof relating to these transactions show that the entries did not reflect the true relation existing between the bank and the defendant officers of the bank, and it was the unlawful intent of defendants, by means of the entries in the books of the bank and the reports based thereon, to deceive the Comptroller of the Currency. The making of any such a report is an offense separate and distinct from the offense of making an earlier false entry in the books of a bank. This was so decided in United States v. Adams, 281 U. S. 202, 50 S. Ct. 269, 74 L. Ed. 807. It follows, therefore, that offenses charged in these counts were committed the date of the report, and were not barred by the statute of limitations.

The evidence is sufficient to sustain conviction on all the counts.

Error is assigned for the failure of the court to give defendant's requested instructions, numbered 1 to 37. We have carefully examined these requested instructions, and such as contain correct statements of law were given in substance and effect. The refusal of the court to give others was not error.

A large number of errors in the instructions given by the court are assigned, and additional ones are claimed and presented which were not assigned.

█ It is argued most insistently that the court committed error in its instructions concerning the Brown note, in connection with which appellant was found guilty for the misapplication of $12,000 of the bank's money. The bank records show that at the time appellant had previously borrowed directly from his own bank, the First National Bank of Beverly Hills, a large sum of money. It is a fair inference from the testimony that appellant did not wish to have it appear on the bank records that the $12,000 was for him, so he resorted to the expedient of having the transaction consummated indirectly through the Bank of America, where the Beverly Hills Bank had on deposit a considerable sum of money. To conceal the fact that Hargreaves was receiving the money directly from his own bank, the following unusual methods were pursued: C. R. Bell, vice president of the Bank of America, requested Brown, who worked under him, also as an official of that bank, to sign the note for $12,000, and at the same time to indorse a cashier's check of the Bank of America for $12,000 issued to him. Brown knew nothing about the transaction, but complied with his superior's request; he received no consideration whatever therefor; no one inquired whether he was worth the amount of the note or not, and Brown himself questioned whether he was worth it unsecured. The records of the Bank of America show that by an entry upon the books the $12,000 was charged against the Bank of Beverly Hills, the books of which bank show that later the money was repaid or credit given to the Bank of America, and the $12,000 cashier's check was credited to Hargreaves' personal account and the money checked out. Thus, appellant converted the $12,000 of the money of the bank of which he was president to his own use, through the instrumentality of Brown, and the money was lost to the bank. In this connection, in commenting upon the testimony in his instructions to the jury the court said:

"Take the Brown incident, for instance. There again upon the question of intent the inquiry arises in my mind: What was the necessity of borrowing that money from the Bank of America in the first place? Does it indicate that the defendant in this action did not want his own bank to know about it at the time? The money admittedly was for his use; why didn't he borrow the money from the bank and give his own note for it? If now, in illustrating the case given you a moment ago, if he could not have gotten that money out of his own bank, then the method used would be a misapplication of funds, even though the Brown note were fully se-

cured, because it would be taking the money when the right to take it did not exist."

The inquiry directed to the conduct of the transaction was for the purpose of establishing the intent, and if, as claimed, it was a comment on the facts, it was sufficiently correct as not to be in violation of the rule permitting a federal judge to comment on the evidence, when the jury are at full liberty to determine the issues of fact for themselves. Smith v. United States, 157 F. 721, 732 (C. C. A. 8).

It is not controlling that appellant may not have been liable directly upon the accommodation instrument, but on the facts he was ultimately liable for the debt; he was liable for benefits received. The transaction was merely a subterfuge. This method was adopted so that the entries on the books and in the reports would not show the true facts—that appellant was getting this money from the bank. On this record the unlawful intent is as clear as the misapplication. By putting the transaction in a fictitious form and thus, in effect, representing to the directors and to the bank that he was making this loan to Brown upon the security of his note, when it was not true, he was deceiving the bank, and incidentally the bank records would not indicate the true nature of the transaction so that government officials would be misled and deceived. In all of this he was deceiving the bank and necessarily defrauding it because of the deceit.

"* * * When a bank officer misapplies the money of the bank, intends the misapplication, and for that purpose gets the money out of the bank by any kind of a false pretense, the inference of intent to injure or defraud, in the statutory sense, cannot be avoided. Galbreath v. U. S. (C. C. A. 6) 257 F. 648, 656. It would not be controlling if the new loan was perfectly good and collectible, the deceit and fraud would remain. * * *" Robinson v. U. S., 30 F.(2d) 25, 27 (C. C. A. 6).

An officer who knowingly makes loans for his own private gain is guilty of misapplication. The statement of the court complained of did not violate the rule permitting proper comment by judges in the federal courts.

As to the counts charging defendant with making false reports to the Comptroller of the Currency, these counts are based upon notes made by third parties, the proceeds of which were diverted to the benefit of either defendant Hargreaves or Scantlin. It is contended that these reports were correct as shown by the books of the bank, and should have been dismissed. The testimony shows that the notes were signed by dummies and that the proceeds were diverted to the use of the defendants. The testimony that these notes were accommodation notes which the makers had no expectation of paying at the time they were given is not denied. The makers received no consideration whatsoever and had no intention of assuming any liability, and the notes were accepted by appellant with this understanding. Concerning a similar situation, the court in Morse v. United States, 174 F. 539, at page 548, 20 Ann. Cas. 938 (C. C. A. 2) said:

"* * * The jury were warranted in finding that these were merely sham notes, that the makers gave them with no intention of assuming responsibility, and that the bank accepted them with the same understanding.

"The entries in question found their way to the books and reports because the defendant set the machinery in motion which required the entries to be made. He knew every detail of the various transactions. They were all devised, accepted, or engineered by him, and the jury were justified in finding that the entries were false, that the defendant knew them to be false, and that they were made with intent to deceive."

The government contends that these notes were so made use of to conceal from the other directors of the bank and from the Comptroller of the Currency the true nature of the transaction. The crime of making false entries by an officer of a national bank with intent to defraud includes an entry on the books of the bank which is intentionally made to represent what is not true, with intent to deceive its officers or defraud the association. Agnew v. U. S., 165 U. S. 36, 52, 17 S. Ct. 235, 41 L. Ed. 624; U. S. v. Darby, 289 U. S. 224, 53 S. Ct. 573, 77 L. Ed. 1137.

The District Court's instruction that where "* * * the defendant or any director borrows and uses an accommodation maker of the note, that that is a liability of the defendant—of the director, or person so borrowing money and should have been placed in the column of liabilities, because the statement of liabilities, being for the information of the Comptroller, should, in order to exhibit a true state of facts, show all of the liabilities, and, as a matter of law, the defendant is liable for money that actually was borrowed for his use, although he

himself might not have signed the paper," was not error. U. S. v. Morse (C. C.) 161 F. 429.

■ It is further objected that the instructions make no proper distinction between the intent required to be shown as a necessary element of false reports, and that necessary where the charge is for misapplication of funds. The instructions as given properly differentiate between intent to defraud necessary in misapplication and the intent to deceive in false entries. What the court said was as follows:

"* * * The statute governing this *offense is to the effect that,* any officer, director, agent or employe of any Federal Reserve Bank, or any member bank, who embezzles, abstracts, or wilfully misapplies any of the money, funds, or credit of such member bank, or who makes any false entry in any report or statement of such member bank, with intent, in any case, to injure or defraud such member bank, or to deceive the Comptroller of the Currency, or any agent or examiner appointed to examine the affairs of such member bank, shall be guilty of a certain offense. Note the reading: 'who wilfully misapplies any of the money', or 'who makes any false entry in any report to the Comptroller of the Currency with intent, in any case, to injure or defraud the bank or to deceive the Comptroller of the Currency, or any agent employed by him.'

"The intent must be present to injure or defraud the Bank and, with respect to the reports, to deceive the Comptroller of the Currency. If the act is done, and you believe beyond a reasonable doubt that the intent existed, then, of course, you have no recourse except to find the defendant guilty. If the false report was made and you believe beyond a reasonable doubt from the evidence that the intent existed to deceive the Comptroller of the Currency or any bank examiner, you have no alternative but to find the defendant guilty."

The court then followed with other specific instructions with respect to making reports, and then returned again to the subject of misapplication of funds, explaining as follows:

"* * * When does misapplication occur? Misapplication means a conversion —means that the funds of the bank shall be applied to the use or benefit of the person charged, or of some other person other than the bank. If anybody, therefore, unlawfully and with intent to take the money out of the bank to injure the bank, impair its resources,

misapplies the money, he shall be guilty; that is what this law means."

■ In argument, appellant points out as illustrations of the unfairness of the court and as error committed, among others, the following excerpts from the instructions: "If the act is done you have no recourse except to find the defendant guilty," and, "If the false report is made you have no alternative but to find the defendant guilty," again, "It is unnecessary in matters of misapplication that any proof be made by anybody, the proof or loss to the persons misapplying it is of no moment whatever," and again, "I said that intent is to be judged by what was actually done, that, of course, you realize is true, it is bound to be true." These quotations are fragmentary and separated from their context, and do not convey the correct idea of the actual instruction. For instance, the first quotation above as given in the instructions of the court is as follows: "If the act is done and you believe beyond a reasonable doubt that the intent existed, then, of course, you have no recourse except to find the defendant guilty. If the false report is made and you believe beyond a reasonable doubt from the evidence that the intent existed to deceive the Comptroller of the Currency or any bank examiner, you have no alternative but to find the defendant guilty." As to the next criticized instruction, appellee contends that the original language of the court as used was misinterpreted by the reporter; that as given the language was: "It is unnecessary in matters of misapplication that any profit be made by anybody. The profit or loss to the person misapplying it is of no moment whatever." Formulated in this way, the instruction is correct, and the words used have a clear meaning, which, as complained about, they do not have. It is to be noted in this connection also, that none of these above criticized instructions were excepted to and, therefore, are not to be considered by this court.

■ It is a well-settled principle of law that in determining the correctness of instructions, detached phrases and sentences cannot be singled out and considered alone, but must be construed with their context. Colt v. U. S., 190 F. 305, 308 (C. C. A. 8); Michael v. U. S., 7 F.(2d) 865, 866 (C. C. A. 7).

■ The conduct of the judge or the questions propounded by him to the witnesses and, likewise, the allusion in the instructions where, by way of illustration, reference is made to the buying of worthless securities,

and the comment concerning the $400,000 temporarily deposited, which was arranged for the purpose of having it appear that the amount of deposits in the bank were greater in that amount than they really were, did not constitute prejudicial error. Simmons v. U. S., 142 U. S. 148, 12 S. Ct. 171, 35 L. Ed. 968; Adler v. U. S., 182 F. 464 (C. C. A. 5); Buchanan v. U. S., 15 F.(2d) 496 (C. C. A. 8); Kettenbach v. U. S., 202 F. 377 (C. C. A. 9).

The attempt to disqualify the judge by affidavit filed after the trial besides being insufficient was too late. Henry v. Speer, 201 F. 869 (C. C. A. 5).

Conceding that many of the errors urged in this court were not excepted to at the trial and not assigned as error, the appellant makes the plea that this court may notice plain error in a criminal case though not assigned. Acceding to this suggestion, we have examined the record with a good deal of care. However, it will serve no good purpose to notice in detail all of the numerous contentions presented. Suffice to say that the instructions of the court as given, all taken together, fairly stated the law on questions involved, and, after an examination of the entire record, there appeared to be no errors or defects that affected the substantial rights of defendant. 28 USCA § 391; Simpson v. U. S., 289 F. 188 (C. C. A. 9); Armstrong v. U. S., 16 F.(2d) 62 (C. C. A. 9); Stunz v. U. S., 27 F.(2d) 575 (C. C. A. 8).

Affirmed.