UNITED STATES of America,
Plaintiff-Appellee,

v.

**Thomas E. WOLF, Defendant-Appellant.**

No. 86–3041.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 5, 1987.

Decided July 6, 1987.

Lance A. Caldwell, Portland, Or., for plaintiff-appellee.

Norman Sepenuk, Portland, Or., for defendant-appellant.

Before KOELSCH, GOODWIN and THOMPSON, Circuit Judges.

GOODWIN, Circuit Judge:

Thomas Wolf appeals his conviction on numerous counts of misapplying bank funds, 18 U.S.C. § 656; making false entries in bank records, 18 U.S.C. § 1005; and one count each of issuing an obligation of the bank without authorization, 18 U.S.C. § 1005, and conspiring to defraud the United States, 18 U.S.C. § 371. Wolf argues that the evidence did not sustain the verdict and that references to violations of civil bank regulations unfairly prejudiced him. We hold that sufficient evidence supported the verdict, but that the testimony and arguments regarding civil bank regulations tainted the trial on most of the misapplication and false entry counts. We affirm in part, reverse in part and remand for retrial.

Wolf was a founder and director of Columbia Pacific Bank in Portland, Oregon. From the bank's inception in 1976 to its ruin in 1983, Wolf served as its chief legal counsel and sat on its board of directors. At the same time, he was trustee for his law firm's retirement trust account, which invested several hundred thousand dollars in the bank. From about 1978 on, Wolf was also one of four founders and shareholders of First Northwest Mortgage Company, which made loans to real estate developers. Columbia Pacific Bank was the mortgage company's main source of capital and Wolf used his connections at the bank to fund loans for the mortgage company.

First Northwest borrowed more than $400,000 from Columbia Pacific, reaching the borrower's legal limit for that type of loan under Oregon law. When the mortgage company needed more capital, Wolf arranged for his fellow shareholders in Northwest Mortgage, Dale Brookens, Les Hardy and Anderson Griffith (who was also Wolf's law partner), to establish individual lines of credit at Columbia Pacific. Wolf prevailed on the bank's president, Thomas Pendergraft, to approve loans of hundreds of thousands of dollars to the shareholders, who immediately turned over the loan proceeds to First Northwest. The loan documents listed Brookens, Hardy and Griffith as the borrowers and did not indicate that the beneficial user would be First Northwest. When Pendergraft reported the loans to the other directors, as he was required to do, he likewise did not disclose that the loans to the individuals were ultimately used to supply funds to First Northwest.

In two successive annual director's reports, Wolf disclosed to Columbia Pacific his interest in First Northwest. Wolf stopped these disclosures after July 1980 when he transferred title to most of his First Northwest shares to his law partner and fellow shareholder, Griffith. Wolf also did not disclose to the bank that he had signed a guarantee making him jointly liable with fellow First Northwest shareholders for the loans taken from Columbia Pacific for the benefit of First Northwest.

First Northwest initially repaid its various Columbia Pacific loans from its returns on real estate loans. When Oregon's economy abruptly declined in the early 1980's, however, many of First Northwest's customers fell behind on their mortgage repayments and First Northwest found it increasingly difficult to repay Columbia Pacific. Disaster struck when First Northwest attempted to rescue one of its struggling customers, the CAS company of Medford, Oregon. At Wolf's instigation, the CAS company reorganized, becoming the Village Joint Venture Partnership, which borrowed approximately one million dollars from First Northwest. When this loan failed to restore the vitality of Village Joint Venture, Wolf next suggested that the company go into partnership with three of First Northwest's partners, Griffith, Brookens and himself. (Hardy, by this time, had dropped out of First Northwest). He

proposed that each participant put up a substantial sum of money, which would enable Village to pay its debts and begin to develop property. The joint venture partners eagerly accepted this proposal. Village Joint Venture became the Central Point Development Company, which inherited the financial debility of Village. Central Point soon found itself urgently in need of money. Wolf suggested that it borrow from Columbia Pacific. As Central Point would need far more money than Columbia Pacific could legally lend to any one customer, Wolf caused Central Point to spin off two new companies, Kingsland Manor Partnership and Rogue Valley Corporation. Central Point, Kingsland and Rogue Valley each borrowed hundreds of thousands of dollars from Columbia Pacific without revealing Wolf's relationship to these entities.

Another event leading to Wolf's prosecution occurred when First Northwest sought to borrow money from Canadian Imperial Bank of Commerce. Canadian Imperial refused to lend money to First Northwest until the borrower obtained a "take out" commitment from another bank to provide permanent financing after six months. At Wolf's urging, Pendergraft provided a letter committing Columbia Pacific to the "take out" loan without informing the bank's board of directors.

Columbia Pacific failed in 1983. In 1984, the grand jury returned a 41–count indictment against Wolf. Count 1 charged him with conspiring with Pendergraft and others to defraud the United States by concealing from bank examiners his interest in the loans to First Northwest and its shareholders and related companies. Counts 2–15 charged him with misapplying bank funds in connection with Columbia Pacific's loans to Brookens, Hardy and Griffith. Counts 16–29 charged him with making or causing to be made false entries in connection with the same loans. Count 30 charged him with causing the issuance of an obligation of the bank without authority from directors. Counts 31–33 charged him with misapplication of bank funds in connection with the loans to Kingsland Manor, Rogue Valley and Central Point. Counts

34–36 charged him with making a false entry with regard to the same loans. (Count 36, which involved the Central Point loan, was later dropped from the indictment). The remaining counts, 37–41, charged Wolf with false entries in connection with the annual director's audit confirmations and other documents which failed to disclose his interests in loans from Columbia Pacific to entities under his control.

Before Wolf's trial, defense counsel moved to strike from the indictment all reference to civil banking statutes. The court denied the motion.

At trial, Richard Warriner, a bank examiner for the Federal Deposit Insurance Corporation, testified over Wolf's objection regarding Federal Reserve Board Regulation O (12 C.F.R. § 215), and Oregon Revised Statute § 708.305, pertaining to bank lending limits. At the close of the evidence, Wolf proposed jury instructions defining terms in Regulation O and explaining that Or.Rev.Stat. § 708.305 permitted the bank to lend money to related corporations even if the aggregate sum exceeded the maximum the bank could lend to any one borrower. The court refused to give Wolf's proposed instructions, and instead instructed the jury that the testimony about civil banking laws was background information only. The jury convicted Wolf on all counts.

Wolf argues that the district court erred in denying his motion for acquittal. Fed.R. Crim.P. 29(a) requires the district court to grant a motion for acquittal if the evidence is insufficient to sustain a conviction. On appeal from the denial of such a motion, we review de novo the sufficiency of the evidence and affirm if, viewing the evidence in the light most favorable to the government, any rational juror could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Buras*, 633 F.2d 1356, 1359 (9th Cir.1980).

■ The elements of the crime of misapplication of bank funds, 18 U.S.C. § 656, are: (1) defendant is an executive officer of

a bank; (2) the bank is connected with the Federal Reserve; (3) defendant willfully misapplied the bank's funds; and (4) defendant acted with intent to injure and defraud the bank. *United States v. Christo,* 614 F.2d 486, 490 (5th Cir.1980); *United States v. Krepps,* 605 F.2d 101 (3d Cir. 1979). Wolf concedes the first two elements, but argues that the government did not prove willful misapplication or criminal intent.

The misapplication charges in Counts 2–15 derived from the loans Columbia Pacific made to Griffith, Hardy and Brookens for the benefit of First Northwest. Counts 31–33 derived from the loans Columbia Pacific made to Kingsland Manor and Rogue Valley for the benefit of Central Point Development Company. With regard to each series of loans, the jury found that Wolf failed to disclose either the ultimate recipient of the borrowed funds or that he had an interest in the loans. This nondisclosure, the government argues, caused the bank to make loans it otherwise would not have made.

■ Wolf admits that Griffith, Hardy and Brookens borrowed from Columbia Pacific in order to transfer funds to First Northwest and that Kingsland Manor and Rogue Valley borrowed in order to transfer funds to Central Point Development. Wolf asserts that these transactions do not constitute misapplication because the "nominal" borrowers were willing and able to repay the loans. Ability to repay is not a defense in this circuit. *United States v. Kennedy,* 564 F.2d 1329 (9th Cir.), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); *Hargreaves v. United States,* 75 F.2d 68 (9th Cir.), *cert. denied,* 295 U.S. 759, 55 S.Ct. 920, 79 L.Ed. 1701 (1935). In *Kennedy,* we found misapplication even though the nominal borrower was willing and able to repay the loan. 564 F.2d at 1338–39. We stated that a misapplication occurs whenever bank funds are lent under a record that misrepresents a material fact, such as the name of the true borrower or the purpose of the loan. 564 F.2d at 1338–39.

■ *Kennedy* applies here. Like the *Kennedy* borrowers, Griffith, Hardy, Brookens and the two companies each failed to disclose their intention to hand the loan proceeds over to another entity. The evidence makes clear that Wolf arranged all these loans and supervised the loan applications, with the result that the loans were made under a record that misrepresented the true borrower and the purpose of the loans. Wolf's actions amounted to misapplication.

■ The intent element of 18 U.S.C. § 656 is satisfied if the accused intends to deceive bank officials, bank examiners or the Federal Deposit Insurance Corporation. There need be no intent to injure. *See Kennedy,* 564 F.2d at 1339. Overwhelming evidence at trial established that Wolf arranged the nominee loans in order to deceive bank officials and examiners as to the identity of the true borrower and to conceal his own interest in the loan. A prime example of this knowing deception is the transaction in which he "sold" most of his First Northwest shares to Griffith. Griffith testified that Wolf asked him to buy the shares so that Wolf would no longer have to report his interest in any transaction benefiting First Northwest. He also testified that he paid for the shares with a promissory note for a fraction of the shares' value, and understood that Wolf would never actually require payment. The record shows that Wolf continued to exercise the same control over First Northwest after the transaction as before. In short, the entire transaction was a smokescreen designed to hide Wolf's continuing interest in loans made to First Northwest.

With regard to the lending limits, Wolf testified that he arranged the loans to Griffith, Brookens, Hardy and the development companies only because First Northwest and Central Point could not borrow enough money directly. Although he argues now that he saw nothing illegal in arranging nominee loans, he never disclosed to the board of directors the true beneficiaries of the loans. The evidence was sufficient for a jury to find that Wolf intended to deceive bank officials in arranging the loans.

■ The false entry counts arise from the same loans that gave rise to the misapplication charges. The elements of false entry, 18 U.S.C. §§ 1005 and 2, are: (1) defendant made a false entry in bank records, caused it to be made, or aided and abetted its entry; (2) defendant knew the entry was false when it was made; and (3) defendant intended that the entry injure or deceive a bank or public official. *United States v. Jackson*, 621 F.2d 216, 219 (5th Cir.1980). *See Hargreaves*, 75 F.2d at 72.

■ The jury found that the bank's records of the loans were false in that they did not reflect either the true borrower or the actual purpose of the loans. The record abounds with evidence that the loans entered on the books as going to Brookens, Hardy, Griffith and the development companies were actually destined for First Northwest and Central Point Development.

The record also supports the jury's determination that Wolf knew the entries were false and caused them to be made. The nominee loans were not only his brainchild, but he helped arrange them. The jury did not need to find that Wolf himself made the entry in the bank's books; it suffices that he set into motion management actions that necessarily caused clerks to make false entries. *Krepps*, 605 F.2d at 109 n. 28. Finally, Wolf had the necessary intent because he intended to deceive bank officials. *See Hargreaves*, 75 F.2d at 72.

Because we have found that the evidence on misapplication of bank funds and false entry charges was sufficient to support the jury's verdict, Wolf's argument that the conspiracy count must fail is without merit.

Wolf argues that evidence and arguments concerning his possible violations of civil banking regulation impermissibly tainted the trial on the counts relating to the nominee loans. We agree.

The leading cases on the use of evidence regarding civil violations in a criminal misapplication case are *United States v. Christo*, 614 F.2d 486 (5th Cir.1980), and *United States v. Stefan*, 784 F.2d 1093, 1098 (11th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 193, 93 L.Ed.2d 125 (1986). The

defendant in *Christo* was both chairman of the board and majority stockholder of a Florida bank. He was indicted for misapplication and false entry based on alleged overdrafting of his checking account in violation of 12 U.S.C. § 375, which prohibits banks from extending credit of more than $5,000 to its own executive officers. At trial, the government repeatedly referred to Christo's violations of the civil statute and the court instructed the jury it could find that the § 375 violations constituted a criminal misapplication of bank funds. Christo was convicted, but the Fifth Circuit held that the government's references to violations of § 375 "impermissibly infected the very purpose for which the trial was being conducted—to determine whether Christo willfully misapplied bank funds with an intent to injure and defraud the bank." 614 F.2d at 492. It further found that the jury instructions compounded the error by focusing attention on § 375, *id.*, and reversed the conviction.

In *United States v. Stefan*, the Eleventh Circuit distinguished *Christo* in affirming a conviction for misapplication and false entry where the government introduced evidence of civil lending limits. The court read *Christo* to forbid introducing evidence of civil banking statute violations solely to prove criminal misapplication; it held that *Christo* did not apply when the evidence was introduced for other, legitimate, purposes. 784 F.2d at 1098. The court affirmed the conviction because it found the government had referred to civil bank lending limits only to show Stefan's motive in arranging sham loans to straw borrowers, and agreed with the government that the jury could not understand the case without knowing about the lending limits. The court also approved a jury instruction to the effect that a civil violation should not be considered as a violation of the criminal law, but that evidence of the civil violations could be considered as evidence bearing on the defendants' intent. *Id.* at 1099. The court concluded that the tenor of the trial was completely different from that in *Christo*, and affirmed Stefan's conviction.

■ With regard to the evidence of bank lending limits, we have no trouble in finding this case more akin to *Stefan* than to *Christo*. It was clear throughout the trial that Wolf was not being tried for violating the lending limits. The focus was on whether certain loans were made under a false record. The government charged and proved that Wolf concealed the identity of the true borrower of the bank's funds, and in doing so committed both misapplication and false entry. As in *Stefan*, violation of lending limits was not directly or indirectly an element of any of the charges. Lending limits provided background information bearing on motive and intent. The court properly made this clear in its jury instructions by describing the civil violations as background only.

■ We are far more troubled by the references to violations of Regulation O, which requires approval of a majority of the board of directors to approve loans made to bank officers or executives or to businesses that they control. Unlike references to lending limit violations, the references to Regulation O cannot be dismissed as being simply background information. The references were a key part of the government's case on the misapplication and false entry counts. With regard to each of these counts, the indictment charged that Wolf committed a criminal act in part because the loan applications failed to disclose Wolf's connection with First Northwest, the ultimate beneficiary of the loans. However, neither § 656 nor § 1005 requires a loan applicant to reveal any particular information. The government points out that one can commit misapplication and false entry by failing to disclose a material fact on a bank document. *Krepps*, 605 F.2d at 109. This response

begs the question whether Wolf's connection with First Northwest was a material fact for purposes of the loan applications. The loan applications themselves did not ask for such information; neither does any criminal statute. *Cf. United States v. Murphy*, 809 F.2d 1427 (9th Cir.1987) (defendant could not be convicted of conspiracy to defraud the United States simply because during certain bank transactions he concealed information that no statute required him to disclose); *United States v. Varbel*, 780 F.2d 758 (9th Cir.1986) (same).

To supply the missing element of the false entry and misapplication charges, the government turned to Regulation O. Through its expert witness the government established that Regulation O imposed a duty on Wolf to inform the bank's directors that he had an interest in the loans for which Griffith, Brookens, Hardy and the development companies were applying. In sum, the government used Regulation O to supply a crucial element of the misapplication and false entry charges.[1] The jury instructions, which described Regulation O as background evidence, could not repair the damage caused by the indictment, testimony and argument. With regard to the alleged nominee loans, the situation created a serious risk that the jury would find Wolf guilty of criminal misapplication and false entry because he failed to comply with Regulation O.

The taint from the improper use of Regulation O does not extend to the conspiracy count or the counts concerning the director's audits and the commitment letter on the Canadian Imperial loan. Regulation O had nothing to do with the audits or letter, and there is no reason to believe the jury considered it in deliberating these counts.[2] Therefore, we reverse and re-

---

1. We note that the government did not need to rely upon Regulation O. The evidence that each loan application misidentified the true borrower would have been enough to sustain the convictions for misapplication and false entry. However, the indictment and the government's evidence and argument made Regulation O a key element of the charges by suggesting that it was criminal to submit loan applications that did not satisfy Regulation O's disclosure requirement.

2. Although the government alleged that Wolf violated the false entry statute by failing to disclose his interest in First Northwest, it did not have to use Regulation O to define the duty to disclose. The confirmation forms themselves described in detail under what circumstances disclosure was required. For that reason, the jury would have no reason to resort to Regulation O in its deliberations. The charge relating to the confirmation letter did not involve a failure to disclose.

mand for retrial on Counts 2–29 and 31–35 only. We affirm the convictions on Counts 1, 30 and 37–41.

Affirmed in part, reversed in part, and remanded.