**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

VIVIAN TAT, AKA Vivian Lnu,
*Defendant-Appellant.*

No. 19-50034

D.C. No.
2:14-cr-00702-
ODW-2

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted March 4, 2021
Submission Withdrawn April 7, 2021
Resubmitted October 14, 2021
Pasadena, California

Filed October 21, 2021

Before: Susan P. Graber and Eric D. Miller, Circuit
Judges, and Timothy Hillman,[*] District Judge.

Opinion by Judge Graber

---

   [*] The Honorable Timothy Hillman, United States District Judge for the District of Massachusetts, sitting by designation.

**SUMMARY**[**]

**Criminal Law**

The panel reversed a conviction on one count of making a false entry in bank records in violation of 18 U.S.C. § 1005 (Count 3), affirmed a conviction on a second count of the same offense (Count 2), and remanded for resentencing in a case in which Vivian Tat aided a money-laundering scheme involving cashier's checks while she managed a branch of East West Bank in San Gabriel, California.

The panel reversed the conviction on Count 3, which was premised on a bank log record stating that Tat's customer purchased and then returned three cashier's checks for a sum of $25,000. The government acknowledged that the record did not contain a literal falsehood. The record did not contain an omission such that the bank's records would not indicate the true nature of the transaction, and it could not be said that the bank would not have a picture of the bank's true condition without knowing that its customer had come into a large amount of cash that she opted not to deposit. Noting that 18 U.S.C. § 1956—not § 1005— outlaws money laundering, the panel explained that accurate records reflecting a customer's purchase of a cashier's check from her bank account are not false entries under § 1005 solely because that check has a nexus to money laundering.

The panel affirmed the conviction on Count 2 because a reasonable juror could find beyond a reasonable doubt that

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Tat knew the log record on which it was based contained a false entry for the simple reason that it listed a fictitious payee.

The panel affirmed Tat's and her codefendant's convictions for conspiring to launder money in a concurrently filed memorandum disposition.

**COUNSEL**

Erwin Chemerinsky (argued), University of California, Berkeley School of Law, Berkeley, California; David K. Willingham, King & Spalding LLP, Los Angeles, California; Michael V. Schafler and Allysa D. Bell, Cohen Williams LLP, Los Angeles, California; for Defendant-Appellant.

Bram Alden (argued), Deputy Chief, Criminal Appeals Section; L. Ashley Aull, Chief, Criminal Appeals Section; Tracy L. Wilkison, Acting United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

**OPINION**

GRABER, Circuit Judge:

Defendant Vivian Tat aided a money-laundering scheme involving cashier's checks while she managed a branch of East West Bank in San Gabriel, California. A jury convicted her on one count of conspiring to launder money, in violation of 18 U.S.C. § 1956(h), and on two counts of making false entries in the bank's records, in violation of 18 U.S.C.

§ 1005.  She timely appeals.  In this opinion, we address her argument that insufficient evidence supported the false-entry convictions.[1]  Reviewing de novo, *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010), we agree with her only in part:  sufficient evidence supported one of the convictions but not the other.  We therefore reverse the unsupported conviction and remand the case for resentencing.

## BACKGROUND

This appeal stems from a sting operation to uncover money laundering near Los Angeles.  In 2014, the government indicted Ruimin Zhao; Raymond Tan, who is Zhao's husband; and Defendant for conspiring to launder $25,500 in 2009.  Four years later, the government added two counts that accused Defendant Tat of making false entries in the bank's records.

The scheme went this way:  Jimmy Yip, the government's informant and a former racketeer, persuaded Tan to convert proceeds from Yip's purported drug sales into cashier's checks.  Yip's money actually came from the Federal Bureau of Investigation ("FBI").  In exchange, Yip would pay Tan $4500.  Tan said that he was the man for the job because his wife knew an insider at a local bank: Defendant.  Tan and Yip agreed that the checks would be made out to a fictitious "Oscar Santana."

Defendant, meanwhile, knew that one of her customers sought a way to withdraw a large amount of cash without showing the withdrawal on her account.  (The customer

---

[1] We affirm Defendant's and her codefendant's convictions for conspiring to launder money in a concurrently filed memorandum disposition.

wanted to shield it in her divorce proceedings.) Defendant proposed a trade: if the customer drew $25,500 in three cashier's checks from her account, Defendant knew someone who would pay off-the-books cash for them. The customer agreed.

Yip, wearing a secret camera, met the coconspirators in one of the bank's conference rooms on December 14, 2009. Yip's money was counted, the cashier's checks were signed, and all sides went on their way. But Defendant's customer thought something felt off—why did she have to make the checks out to an Oscar Santana? She asked Defendant to reverse the transactions.

The bank's logs, presented as Exhibit 48 at trial, document both the checks' purchase and their return. The logs record that, on December 14, the customer purchased three cashier's checks worth a combined $25,500 and then reversed those transactions. At trial, the government elicited testimony that (1) Yip gave the customer $25,500; (2) the customer drew $25,500 in cashier's checks from her account; (3) Defendant gave those cashier's checks to Yip; and (4) Defendant reversed the transactions at the customer's request.

Timothy Truong, the bank's custodian of records, testified that, although the logs contained in Exhibit 48 can show the account from which the cashier's checks were drawn, those logs cannot show the source of any simultaneously received cash that the customer did not deposit. In other words, Truong testified that those logs could not disclose Yip's involvement.

After the original checks were returned, Tan and Zhao, working with Defendant, obtained replacement cashier's checks in their own names. One of those replacement checks

was documented in the bank's logs, which the government introduced as Exhibit 47 at trial. That log shows that, on December 14, Zhao drew a $7500 cashier's check payable to "Oscar Santana" from the account of her facial and massage business. At trial, the government elicited testimony that Zhao went to the bank; deposited $7500 in cash; purchased a cashier's check for $7500 with a check from her business account; and then gave that cashier's check to Tan, who gave it to Yip. Zhao's account lacked sufficient funds to cover the cashier's check before her deposit of Yip's money.

Truong testified that the logs shown in Exhibit 47 do not allow the bank's employees to list the source of a purchaser's funds. In other words, Truong testified that the logs can show that a customer paid for the cashier's check in cash, but they cannot show that cash's source. The government also presented evidence that the check from Zhao's business account, used to draw the cashier's check, featured Defendant's handwriting.

Tan pleaded guilty to conspiring to launder money. Defendant and Zhao went to trial. The jury convicted them both of conspiring to launder money, 18 U.S.C. § 1956(h), and it convicted Defendant of two counts (Counts 2 and 3) of making a false entry in a bank's records, 18 U.S.C. § 1005.

## DISCUSSION

Defendant argues that insufficient evidence supports her false-entry convictions. We "must consider the evidence presented at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). We then "must determine whether this evidence, so viewed, is adequate to allow 'any rational

trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *Id.* (alteration in original) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). If the evidence fails at that second step, we must reverse. *Id.* at 1165.

Our analysis of a criminal statute begins with its text. *United States v. Price*, 980 F.3d 1211, 1218 (9th Cir. 2019). As relevant here, § 1005 criminalizes:

> mak[ing] *any false entry* in any book, report, or statement of such bank, company, branch, agency, or organization *with intent to injure or defraud* such bank, company, branch, agency, or organization, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System[.]

§ 1005 (emphases added). Thus, the government must prove that "(1) [D]efendant made a false entry in bank records, caused it to be made, or aided and abetted its entry; (2) [D]efendant knew the entry was false when it was made; and (3) [D]efendant intended that the entry injure or deceive a bank or public official." *United States v. Wolf*, 820 F.2d 1499, 1504 (9th Cir. 1987). The parties dispute only whether the government proved falsity.

The Supreme Court held, more than a century ago, that "the making of a false entry is a concrete offense, which is not committed where the transaction entered actually took place, and is entered exactly as it occurred." *Coffin v. United States*, 156 U.S. 432, 463 (1895). But courts have expanded the reach of § 1005 (and its predecessor, 12 U.S.C. § 592) beyond literal falsity; "material omissions are false statements for the purposes of" the statute. *United States v. Ely*, 142 F.3d 1113, 1119 (9th Cir. 1997); *see United States v. Darby*, 289 U.S. 224, 226 (1933) (holding that § 592's "aim was to give assurance that upon an inspection of a bank, public officers and others would discover in its books of account a picture of its true condition").

In the context of fraudulent loans, such an omission might include "focus[ing] on whether the transaction is real and substantial as opposed to merely formal." *United States v. Krepps*, 605 F.2d 101, 109 (3d Cir. 1979). That reasoning makes sense with respect to loans—where the concern is that hiding information from officials prevents them from assessing a bank's exposure. *See id.* (holding that "those who are charged by law with the examination of these records have a significant interest in obtaining a full picture of the bank's actual condition"). For example, we held that a bank executive caused a false entry under § 592 when he directed an uncompensated straw man to obtain a loan— disbursed as a cashier's check—because that straw man (1) was unqualified for the loan; (2) had no plans to repay the loan; and (3) immediately gave the cashier's check to the defendant. *Hargreaves v. United States*, 75 F.2d 68, 70–71 (9th Cir. 1935). Because the transaction was "fictitious," the bank's "records would not indicate the true nature of the transaction" and, thus, contained a false entry. *Id.* at 72. Likewise, § 1005 criminalizes the omission of one's true purpose in seeking a loan. *Wolf*, 820 F.2d at 1503–04.

But we agree with the Fifth Circuit that the same reasoning does not necessarily apply to banks' accurate records of customers' withdrawals. In *United States v. Manderson*, 511 F.2d 179 (5th Cir. 1975), the defendant was an employee of a mortgage company who sought to extort a contractor before releasing the payment for a home's repairs. *Id.* at 180. The contractor, knowing extortion when he saw it, contacted the mortgage company's bank, which in turn contacted the FBI. *Id.* The FBI provided the contractor with marked bills, which the contractor then paid to the defendant. *Id.* The defendant released the funds for the repairs to the contractor and documented that transaction in the mortgage company's checkbook. *Id.*

The Fifth Circuit held that the defendant's checkbook entry was not a false entry under § 1005. *Id.*

> The checkbook stub correctly reflected the date, the payees, for what the check was issued, its application to the escrow account, the account number, and the amount. There was no false entry unless it can be said that appellant's attempt to enrich himself at the expense of [the contractor] and [the homeowner] rendered it such. There was no attempt to defraud [the mortgage company] or the Bank and neither was defrauded. Appellant correctly reflected the transaction in the books of the Bank.

*Id.* Because the bank's record is "the very entry that should have been made had there been no later effort to extort," that record is not "lacking in verity." *Id.* at 181. In other words, that an accurately recorded bank transaction has a nexus to unlawful activity does not, standing alone, make all entries

related to that transaction "false" within the meaning of § 1005. Other courts have held the same. "[A]n entry is not false merely because the underlying transaction is illegal," *United States v. Gleason*, 616 F.2d 2, 29 (2d Cir. 1979); "questionable," *United States v. Hardin*, 841 F.2d 694, 699 (6th Cir. 1988); "manipulative," *id.*; or "fraudulent," *United States v. Erickson*, 601 F.2d 296, 302 (7th Cir. 1979). We agree with our sister circuits' analysis on that point. We turn, then, to applying those principles to Defendant's convictions for making false entries in violation of § 1005.

A. *Count 3*

Count 3 is premised on the bank's log shown in Exhibit 48. That log states that Defendant's customer purchased and then returned three cashier's checks for a sum of $25,500. The government acknowledges that the record does not contain a literal falsehood.

Nor does Exhibit 48 contain an omission such that the bank's "records would not indicate the true nature of the transaction." *Hargreaves*, 75 F.2d at 72. The government argues that our decision in *Hargreaves* controls here. We disagree. Although *Hargreaves* mentions a "cashier's check," it really is a case about a fraudulent loan; the bank was duped into lending money to an unworthy borrower. *Id.* at 70. As we recently held in another case concerning the scope of § 1005, the entry in *Hargreaves* implicated our often-expressed concern that banks need to know borrowers' true identities. *United States v. Yates*, No. 18-30183, 2021 WL 4699251, at *11 (9th Cir. October 8, 2021) (citing *Hargreaves*, 75 F.2d at 70, 72). Count 3 causes no such concern.

The only witness to testify on the matter stated that Defendant could not have disclosed the source of the

customer's unbanked cash on the log contained in Exhibit 48. "The form does not call for a narrative response, allow for comment, . . . or ask for the source of a payment" to the customer. *Id.* at \*12. She could disclose only that the customer purchased and returned cashier's checks. The government points to no document related to the cashier's checks in question that Defendant completed falsely or that she should have completed but did not. *Cf. United States v. Cordell*, 912 F.2d 769, 773–74 (5th Cir. 1990) (holding that a bank manager violated § 1005 when he declined to file a *required* overdraft notice so that he could conceal from his supervisors a violation of federal lending limits); *United States v. McAnally*, 666 F.2d 1116, 1118 (7th Cir. 1981) (holding that the bank's employee violated § 1005 by failing to record a loan even if "there was no false entry in a literal sense").

It also cannot be said that East West Bank would not have "a picture of [the bank's] true condition," *Darby*, 289 U.S. at 226, without knowing that its customer had come into a large amount of cash that she opted not to deposit. Cashier's checks—unlike loans—cannot be issued until the bank receives funds. The bank would know that a real customer drew a real cashier's check from the undisputed balance of her real account. How one chooses to "dispose of the fund[s] so obtained should, in the absence of misrepresentation on h[er] part, be of no interest to the bank, and certainly not to the criminal law." *Krepps*, 605 F.2d at 106.

Indeed, Exhibit 48 is "the very entry that should have been made had there been no" prior effort to launder money. *Manderson*, 511 F.2d at 181. If Defendant's customer purchased a cashier's check and gave it to Yip in exchange for a used car, Exhibit 48 would look the same. Even if

Defendant made the entries with an intent to deceive bank officials, that satisfies only one of §1005's three elements. *Wolf*, 820 F.2d at 1504. An intent to deceive is the offense's mens rea, *not* the entire offense. It is no answer that the cashier's check was related to a money laundering scheme; § 1956—not § 1005—outlaws money laundering. Accurate records reflecting a customer's purchase of a cashier's check from her bank account are not false entries under § 1005 solely because that check has a nexus to money laundering. We thus reverse Defendant's conviction on Count 3.

## B. *Count 2*

Count 2 is premised on the bank's log shown in Exhibit 47. The log shows that, on December 14, Zhao deposited $7500 (of the FBI's money) and then drew a cashier's check payable to "Oscar Santana" for that same amount. A reasonable juror could find beyond a reasonable doubt that Defendant knew that Exhibit 47, the basis of Count 2, contained a false entry for the simple reason that it listed a fictitious payee. That fact is sufficient to sustain a conviction under the principles described above; the transaction itself is "false and fictitious" and "concocted for the very purpose of distorting [a] financial statement." *Yates*, 2021 WL 4699251, at *11 (alteration in original) (quoting *Gleason*, 616 F.2d at 29). Indeed, as the government argued to the jury, "on its face, [we] know why it's false, because here it shows a cashier's check in the amount of $7500 to Oscar Santana." And § 1005 criminalizes the making of "any" false entry with the requisite mens rea. The jury was not required to accept Defendant's argument that she did not know that the name was fictitious.

Unlike in *Manderson*, the log does not "correctly reflect[] . . . the payee[] . . . [or] for what the check was

issued." 511 F.2d at 180. And unlike the log in Exhibit 48, the log in Exhibit 47 gave Defendant the opportunity to disclose that information. Thus, there is no "absence of misrepresentation," and the log very much is of "interest to the bank, and . . . the criminal law." *Krepps*, 605 F.2d at 106. We thus affirm Defendant's conviction on Count 2.

We **REVERSE** Defendant's conviction on Count 3; **AFFIRM** her conviction on Count 2; and **REMAND** for resentencing.