**UNITED STATES of America, Plaintiff–Appellee/Cross–Appellant,**

v.

**Ralph E. WHITMORE, Jr., Defendant–Appellant/Cross–Appellee.**

**United States of America, Plaintiff–Appellee,**

v.

**H. Derrell Smith, Defendant–Appellant.**

Nos. 00–30152, 00–30183, 00–30188.

D.C. No. CR–94–00136–HRH.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 2001.

Decided Feb. 11, 2002.

Before REAVLEY,* B. FLETCHER, and TALLMAN, Circuit Judges.

## MEMORANDUM **

Ralph E. Whitmore, Jr. ("Whitmore"), Chief Executive Officer of the former Alaska Statebank, appeals his jury conviction of seven counts of bank fraud, 13 counts of making false entries in book and records, and four counts of misapplication of bank funds. Whitmore alleges that the evidence was insufficient to support his conviction. The United States cross-appeals the sentence imposed on Whitmore, arguing that

---

* The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36–3.

the district court erred in sentencing him by improperly departing downward from the range imposed under the United States Sentencing Guidelines ("U.S.S.G."). In a companion case, H. Derrell Smith ("Smith"), former President of Alaska Statebank, appeals his jury conviction on one count of misapplication of bank funds and one count of making false statements regarding a loan. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the convictions and sentences of both Whitmore and Smith.

## I. BACKGROUND

Alaska Statebank ("ASB") was a state chartered and federally insured bank headquartered in Anchorage, Alaska. When ASB closed in 1989, the Federal Deposit Insurance Company ("FDIC") took over as receiver and soon thereafter began an investigation into allegations of misconduct by Whitmore, Smith, and other members of the ASB Board of Directors. A grand jury indicted Whitmore, Smith, and several other board members in 1995 for various bank crimes committed between 1984 and 1989.

By the time of trial the government had negotiated plea agreements with two of the three other charged directors, and proceeded to trial on 37 counts against Whitmore and Smith. This first trial resulted in a hung jury as to most of the charged offenses, although Whitmore was acquitted of one count while Smith was acquitted of four. The government thereafter agreed to dismiss all but two counts against Smith, the "Vozar loan" counts, when he gave testimony against Whitmore at his second trial under a grant of immunity. Whitmore was retried in November 1999 on 26 counts and was convicted on 24: seven counts of bank fraud in violation of 18 U.S.C. § 1344, 13 counts of false entries in violation of 18 U.S.C. § 1005, and four

counts of misapplication of bank funds in violation of 18 U.S.C. § 656.

At sentencing, the district court determined that Whitmore was subject to an offense level of 23 under the U.S.S.G. and a sentencing range of 46–57 months. However, based on its determination that downward departures were warranted on four different bases, the court sentenced Whitmore to 24 months concurrent on each count, a two year term of supervised release, $500,000 in restitution, and a $1,250 special penalty assessment. Smith was convicted of misapplying bank funds in violation of 18 U.S.C. § 656 and of making false statements in connection with a loan in violation of 18 U.S.C. § 1014. Smith was sentenced to three years probation.

We first address the circumstances underlying Whitmore's claims. We then turn to the claims raised by Smith in his appeal.

## II. DEFENDANT WHITMORE

### A. *Factual Background.*

1. *The Original Director Stock Loans.*

As the controlling shareholder, Chairman of the Board, and Chief Executive Officer of ASB, Whitmore exerted considerable control over the bank and its management, including the distribution of loans and dividends. In 1984, Whitmore approached the Board about acquiring the Alaska Bank of the North ("ANBN"), with an eye toward merging it into ASB. Whitmore told the directors that ASB could not legally purchase ANBN directly and therefore requested that the directors help finance the purchase of ANBN by taking out loans from ASB—the "director stock loans"—to buy ANBN stock. While each director signed a letter stating that the loans were personal investments, that they would individually assume the risks, and that there was no agreement to have ASB

protect them in case of default, Whitmore assured each director that they would not be personally responsible for repaying the loans. The directors and Whitmore thereafter entered into a Voting Trust Agreement giving Whitmore sole authority to vote all of the ANBN stock.

Each director received two loans, a $350,000 loan secured by ANBN stock and a $150,000 unsecured loan. Normal loan procedure required that a loan officer first review and analyze all relevant financial information, the purpose of the loan, and the repayment plan. Then, if a loan was recommended, it would be sent to the credit committee for review, where summary cover sheets ("CL–10s") and financial backups were included. Loans to directors were subject to Board review. The Board relied on the credit committee and Whitmore in making its determination. While these normal loan procedures and policies were not followed in all respects with regard to the director stock loans, the loans were nevertheless approved by the credit committee and the Board.

### 2. Rollovers of the Loans.

The Alaskan economy had taken a downturn by the time the loans became due in November 1985. Smith, directed by Whitmore, told Jan Romerdahl ("Romerdahl"), Assistant Vice President of ASB, to roll over the loans and to add an additional $100,000 to some of them. Since Romerdahl had no information on which to base this decision, she prepared only "skimpy" CL–10s, which falsely listed "cash flow" as the source of repayment and did not list the value of the stock. Despite the unusual nature of these CL–10s, the credit committee approved the rollovers and the minutes show that the Board approved them

as well. Smith testified before the grand jury that Whitmore engineered this first loan rollover so that the directors would not have to personally pay off their loans.[1]

The directors' loans again became due in 1986. As a result of the continuing slump in the Alaskan economy, the ANBN stock pledged on the loans was now almost worthless. One director agreed to sign a new promissory note for an increased sum, although he was not asked to pay off the loan once it became due several months later. The three remaining director stock loans were rolled over for an additional year with another $25,000 added to principal. As with the first rollovers, the only documentation that was provided were CL–10s, which falsely listed the primary source of repayment as "business income" and falsely stated that "this extension allows the customer to maximize his investment."

The FDIC conducted an audit in 1987 and confronted ASB about the problems that it observed. In response to questions by the bank examiners, Smith signed a letter to the FDIC outlining ASB's loan procedures, stating that "none of the loans questioned by the FDIC circumvented [the normal loan] process," and that no preferential treatment had been given to bank insiders. One year later, the FDIC again criticized ASB's failure to collect on these loans and characterized the loans as providing preferential treatment to insiders. Smith's grand jury testimony revealed that the rollovers were used by Whitmore to keep the loans current on the books and to prevent the directors from having to pay interest on the loans.

### 3. The 1987 Financial Statements.

Like other banks, ASB had a loan loss reserve ("LLR") to cover all losses in its

---

1. Smith's grand jury testimony was properly admitted as a prior inconsistent statement pursuant to Federal Rule of Evidence 801(d)(1) since Smith recanted his grand jury testimony when he later testified at Whitmore's trial.

loan portfolios as well as other potential losses. If the LLR was understated for any given period, ASB's income would be overstated as it would not accurately reflect the bank's true assets. At ASB, Whitmore had the sole responsibility for determining the LLR and had no formal method of making this determination.

In 1987, Whitmore kept the LLR artificially low in ASB's reports so as to mask the financial difficulties the bank was facing. Despite opposition from ASB officers who refused to sign such falsified financial forms, Whitmore's LLR calculations for 1987 misstated the true financial status of ASB.

### 4. *The Dividends.*

In 1987, Whitmore caused ASB, whose normal practice was to declare an annual dividend of roughly 25 cents per share, to declare four quarterly dividends of $6.50 per share totaling $2.7 million. In order to facilitate the payout of such large dividends, Whitmore falsely told the Board that such payments were necessary to prevent ASB from being closed by one of its lenders, Mellon Bank. Whitmore also caused several related holding companies to declare dividends of $221,000, $90,000 of which went directly to Whitmore. At the same time that it was declaring dividends, ASB was closing branches and drastically cutting expenses.

### 5. *Whitmore's Expenses.*

While the bank's reimbursement policy required that only expenses relating to a bank benefit would be approved by the Board, the policy as applied to Whitmore was not followed. Whitmore's expenses, and even those of his family, were paid by ASB before any Board approval was ever obtained. The expenses incurred by Whitmore and his family from 1986 to 1988 included international travel, a $9,500 initiation fee for a Beverly Hills tennis club, and luxury automotive and entertainment expenses. While Whitmore claimed that these expenses were necessary for making client contacts and for getting new business for ASB outside of Alaska, Whitmore never obtained any foreign investors for ASB and its only customers outside of Alaska were Whitmore and his own attorney.

In 1987, FDIC examiners questioned Whitmore's expenses, especially in light of the financial condition and revenues of ASB. Thereafter, Whitmore directed that certain expenses be excluded from operating expense statements given to the Board. Although the bank paid his expenses totaling $98,650 for 1986, $92,443 for 1987, and $56,870 for 1988, as a result of alterations made by Whitmore, over $35,000 of expenses he incurred between 1987 and 1988 were left unreported.

### 6. *The California Office (Anchorage Financial Inc.).*

In 1987, Whitmore decided to open an information and transmittal office in Beverly Hills, California, for individuals interested in obtaining loans from ASB. Despite the fact that Whitmore had not discussed this office plan with any other ASB officer, or the fact he had not yet received authorization from California regulators to conduct such business, Whitmore incorporated the office as Anchorage Financial Inc. ("AFI"). Even before Whitmore's plan to establish this office had been approved by the Board of Directors, he had expended ASB funds to furnish the office and had entered into a four-year lease for office space in Beverly Hills. When asked to explain this contract, Whitmore falsely told the Board that California banking authorities required that ASB have an office in California before approval to operate within the state would be given.

Whitmore eventually informed the Board that ASB had not received the necessary approval to operate in California. Rather than closing the office, however, Whitmore decided to treat it as an investment office for ASB. He then had the Board appoint his son as an investment officer. Another son had previously been appointed AFI President. Both sons were assigned by Whitmore to the Beverly Hills office.

In 1988, the FDIC once again criticized ASB's practices, this time with regard to Whitmore's expenditures in relation to AFI. The FDIC thereafter issued an order requiring ASB to close AFI. Although Whitmore stated that the office was no longer in operation, he and his sons continued their business there and ASB continued to make lease payments on the property.

In January 1989, with ASB's closing date less than a month away, Whitmore arranged for an auction of the AFI furnishings and equipment, which had cost ASB approximately $300,000. The auction itself was attended by Whitmore, his family, and ten other potential buyers. At Whitmore's direction, his family and an acquaintance obtained 96% of the auction items for 20% of what ASB had originally paid.

### B. *Analysis of the Issues on Appeal.*

### 1. *Sufficiency of the Evidence Claims.*

Whitmore challenges the sufficiency of the evidence to support his convictions on the 24 counts. We review claims of insufficient evidence de novo. *See United States v. Antonakeas,* 255 F.3d 714, 723 (9th Cir.2001). There is sufficient evidence to support a conviction if, "viewing the evidence in the light most favorable to the prosecution and respecting the jury's ability to judge the credibility of the witnesses, resolve factual conflicts, and draw

inferences," any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Castro,* 887 F.2d 988, 994 (9th Cir.1989); *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Where, as here, a claim of sufficiency of the evidence is preserved through a motion for acquittal at the close of the evidence, we review the district court's denial of the motion de novo. *See United States v. Munoz,* 233 F.3d 1117, 1129 (9th Cir.2000).

### a. Sufficiency of Evidence On Bank Fraud Counts.

The seven bank fraud convictions under 18 U.S.C. § 1344 include: Counts 8–10 (rollovers of director stock loans) and Counts 21–24 (dispersal of dividends). A conviction for bank fraud requires that the defendant knowingly (1) engaged in a scheme to defraud a federally chartered or insured financial institution, or (2) participated in a scheme to obtain monies under the custody or control of the federally chartered or insured financial institution by means of materially false statements or representations. *See United States v. Cloud,* 872 F.2d 846, 850 (9th Cir.1989). A statement or representation is false or fraudulent if it is known to be untrue or is made with reckless indifference to its truth or falsity. *See United States v. Gay,* 967 F.2d 322, 326 (9th Cir.1992).

Intent to defraud may be shown by circumstantial evidence, *see United States v. Mason,* 902 F.2d 1434, 1443 (9th Cir. 1990), by the structure of the transactions themselves, *see United States v. Molinaro,* 11 F.3d 853, 857 (9th Cir.1993), or by proof that the defendant recklessly disregarded a bank's interests, *see United States v. Ely,* 142 F.3d 1113, 1121 (9th Cir.1998).

### i. Counts 8–10: Rollovers of Director Stock Loans.

■ Any rational trier of fact could have found the essential elements of bank fraud as to the rollovers of the director stock loans. Whitmore's manipulation of bank policy by, among other things, providing false purposes for loan extensions and giving preferential treatment to director loans, was a sufficient basis for the jury to find that Whitmore had the requisite intent for bank fraud. *See Molinaro*, 11 F.3d at 857 (sufficient evidence of intent where jury could infer defendant coordinated and structured transactions to protect himself and conceal his interest). Whitmore was the "architect of the transactions" and intent to defraud could have been inferred from Whitmore's orchestration of these rollovers to protect the prior investments made by the directors. *Id.*

Further, the jury was entitled to rely on Smith's grand jury testimony that the purpose of the rollovers was to protect the directors from personal liability for the loans by making the loans appear current. Such action by Whitmore evidenced a reckless indifference to the bank's interests and his disregard is sufficient to constitute intent to defraud under § 1344. *See Ely*, 142 F.3d at 1121.

### ii. Counts 21–24: Dispersal of Dividends.

■ The evidence presented to the jury was such that any rational trier of fact could have found the essential elements of bank fraud as to the dispersal of dividends beyond a reasonable doubt. Whitmore lied to the Board by stating that large dividends would be required to keep Mellon Bank from calling its loan and closing ASB. Regardless of what Whitmore's motivations were in requiring such large dividends, the fact that in one year his actions required paying out $2.7 million in divi-

dends at a time of financial crisis for ASB evidences reckless disregard for the interests of the bank itself. *See id.* Such reckless disregard is sufficient to constitute intent to defraud for purposes of a bank fraud conviction. *See id.* ("Neither the openness of the maneuver nor the legal form in which it was dressed remove the stain of fraud if in fact the fiduciaries acted in reckless disregard of the property of [the bank].").

■ Furthermore, "[the Board's] knowledge, ratification, and consent are not *per se* defenses to the charge [of bank fraud]. Instead these are evidentiary matters that may be considered as part of the defense that there was either no willful misapplication or no intent to injure the bank." *United States v. Unruh*, 855 F.2d 1363, 1368 (9th Cir.1988) (citation omitted). Given that "[r]eview by the board is a particularly dubious basis for exculpating the [defendant where] the evidence showed that [the defendant] was the moving force behind the board of directors," *id.* at 1368–69, the jury could have properly inferred that the Board's action in approving the dividends was dictated by Whitmore himself and was therefore insufficient to excuse Whitmore's actions.

### b. Sufficiency of Evidence On False Entry Counts.

■ Whitmore also challenges the sufficiency of the evidence underlying his 13 false entry convictions under 18 U.S.C. § 1005. They include Counts 11–12 (false statements of purpose on CL–10 forms); Count 20 (letter to FDIC denying preferential treatment); Counts 26–33 (false financial statements); and Counts 37–38 (alteration and under-reporting of Whitmore's expenses). A conviction for making false entries in books and records requires that (1) the defendant made or caused to be made, or aided and abetted,

a false entry in the books of a federally insured bank, (2) the defendant knew the entry was false when it was made, and (3) the defendant intended to injure or deceive the bank or a public official, such as an officer of the FDIC. *See United States v. Wolf*, 820 F.2d 1499, 1504 (9th Cir. 1987).

### i. Counts 11 and 12: False Statements on CL–10s.

▓ We are satisfied that the statements on the CL–10s constituted false entries in violation of § 1005. The CL–10 for the first rollover claimed that "the additional funds are a necessary injection of capital to enable expansion of business enterprises." The reason provided for the second rollover was to "maximize [the borrowers'] investment."

Whitmore insists that because he did not direct that these statements be put on the forms, and because there was no testimony indicating that these actions were taken with the intent to deceive, the evidence was insufficient to convict him on these counts. However, here, as in *Wolf*, the records for these rollovers were false because they did not reflect the actual purpose of the extension of the loans, which was to keep the loans current to protect the directors from having to personally repay the loans. The jury did not need to find that Whitmore himself made the false entries-"it suffices that he set into motion management actions that necessarily caused" false entries to be made. *Id.* The jury could have reasonably found that he had the requisite intent to deceive based on the evidence that he was trying to conceal the true purpose of the loans and the rollovers from the FDIC.

### ii. Count 20: False Entry in FDIC Letter.

▓ The letter written to the FDIC denying preferential treatment constituted

a false entry in violation of § 1005. This letter was written in response to an FDIC examination that, among other things, criticized ASB's handling of the director stock loans. Smith testified that the stock loans were indeed preferential in the way they were created and in the way they were handled. Based on such evidence, the jury could have reasonably concluded that Whitmore, through his direction and control, caused the false statement to be made in the letter to the FDIC in order to conceal the true nature of the director stock loans.

### iii. Counts 26–33: False Financial Statements.

▓ The financial statements prepared by Whitmore also constituted false entries in violation of § 1005. Whitmore kept the Loan Loss Reserves artificially low in financial reports so as to mask the financial difficulties that ASB was facing. By making such false entries, he intentionally misrepresented the status of ASB to the FDIC and to the public. Although Whitmore presented some evidence suggesting that his calculations were not in error, viewing the evidence in the light most favorable to the prosecution, the jury could have reasonably found that the understated financial statements did constitute false entries in violation of § 1005.

### iv. Counts 37 and 38: Alteration and Under–Reporting of Expenses.

▓ The alteration and the under-reporting of Whitmore's expenses constituted false entries in violation of § 1005. Testimony at trial revealed that ASB officials were ordered to change the procedures for handling expense accounting and to make changes to the expense summaries to under-report amounts actually expended. This evidence, in addition to the

evidence of Whitmore's control over ASB procedures and policy, was sufficient to allow the jury to reasonably infer that Whitmore "set into motion management actions that necessarily caused" false entries and omissions to be made on the expense reports. *Id.*

### c. Sufficiency of Evidence on Misapplication Counts.

▮▮▮ The four misapplication convictions under 18 U.S.C. § 656 include: Counts 34–36 (misapplication of bank funds to Whitmore's personal use) and Count 39 (misapplication of bank funds in relation to AFI). A conviction for misapplication of funds requires that (1) the defendant was an officer, employee or director, (2) of a federally insured bank, and that (3) the defendant acted with intent to injure or defraud, (4) by willfully misapplying the funds of the bank. *See United States v. Wolfswinkel,* 44 F.3d 782, 786 (9th Cir.1995). Intent to injure can be shown where the defendant intended to deceive bank officials, bank examiners, or the FDIC. *See Wolf,* 820 F.2d at 1503. Willful misapplication can be proven by showing that "funds were disbursed from the bank under a false pretense designed to deceive." *Wolfswinkel,* 44 F.3d at 786.

### i. Counts 34–36: Misapplication for Personal Use.

▮▮ Whitmore's personal use of bank funds constituted misapplication in violation of § 656. Smith testified that there was no valid business justification for the expenses incurred by Whitmore for, among other things, international travel, automotive expenses, and in joining a tennis club in Beverly Hills. Although Whitmore argued that these activities were necessary to "make contacts" for the benefit of ASB, no such contacts were ever made. The jury could have inferred from this evidence that Whitmore intended to deceive bank and regulatory officials as to the true purpose of his expenditures and therefore had the requisite intent to injure under § 656. *See Wolf,* 820 F.2d at 1503.

The jury could have also properly inferred that Whitmore willfully misapplied these funds. Since the bank provided Whitmore with the necessary funds based on his representations that they were being expended for the benefit of ASB, when in fact no such benefit was ever shown, the jury properly inferred that "funds were disbursed from the bank under a false pretense designed to deceive." *Wolfswinkel,* 44 F.3d at 786.

### ii. Count 39: Misapplication as to AFI.

▮▮ Whitmore's use of bank funds to establish and operate AFI constituted misapplication in violation of § 656. Whitmore spent roughly $300,000 to furnish and lease property for AFI's office without ever having received State approval for such an office. Further, ASB had no clients or business in California.

The jury could have also properly determined that Board approval was a "dubious basis for exculpating the [defendant where] the evidence showed that [the defendant] was the moving force behind the board of directors." *Unruh,* 855 F.2d at 1368–69. Given that such large expenditures were made at a time when ASB was on the verge of financial collapse, the jury properly inferred that "funds were disbursed from the bank under a false pretense designed to deceive," *Wolfswinkel,* 44 F.3d at 786, and that Whitmore therefore misapplied bank funds in creating AFI.

### 2. *Government's Cross–Appeal Based on Improper Sentencing Departures.*

On cross-appeal, the government challenges Whitmore's sentence based on its

contention that the district court improperly departed downward. We review the district court's decision to depart from the Sentencing Guidelines for an abuse of discretion. *See Koon v. United States*, 518 U.S. 81, 99–100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Caperna*, 251 F.3d 827, 830 (9th Cir.2001). The abuse of discretion standard requires this Court to "uphold any district court determination that falls within a broad range of permissible conclusions." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). As long as the "district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse." *United States v. Working*, 224 F.3d 1093, 1102 (9th Cir.2000) (en banc) (citation omitted).

▮▮▮ Under the U.S.S.G., a district court may depart from the guideline range where the court finds the existence of "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (2001). With the exception of the factors listed in the guidelines as improper bases for departure, sentencing courts have discretion to determine what factors warrant departure in a particular case. *See Caperna*, 251 F.3d at 830. Downward departures are permitted in "an atypical case where the language of the guideline is applicable but where the defendants's conduct differs significantly from the norm or the 'heartland' of cases addressed by the guideline." *Working*, 224 F.3d at 1099.

In *Koon*, the Supreme Court significantly curtailed appellate review of departure decisions. In doing so, the Court noted that although "Congress was concerned about sentencing disparities, [ ] we are just as convinced that Congress did not intend, by establishing limited appellate review, to vest in appellate courts wide-ranging authority over district court sentencing decisions ... A district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." *Koon*, 518 U.S. at 97–98.

▮▮▮ As *Koon* and other cases have made clear, "it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence." *Koon*, 518 U.S. at 97 (internal quotations omitted); *Solem v. Helm*, 463 U.S. 277, 290 n. 16, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

Thus, we are required to accord substantial deference to most departure decisions of the district court. As we have stated on previous occasions, "district courts are accorded such deference because they 'have an institutional advantage ever appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do.'" *Working*, 224 F.3d at 1099 (citing *Koon*, 518 U.S. at 98). "District courts are 'particularly suited' in determining whether a factor makes a case unusual, because they are 'informed by [their] vantage point and day-to-day experience in criminal sentencing.'" *United States v.*

*Aguirre,* 214 F.3d 1122, 1127 (9th Cir.) (citing *Koon,* 518 U.S. at 98), *cert. denied,* 531 U.S. 970, 121 S.Ct. 408, 148 L.Ed.2d 315 (2000).

The district court found that the guidelines were applicable to the director stock loans as well as the false financial statement convictions. After initially determining that the appropriate guideline offense level was 23, subjecting Whitmore to a guideline range of 46–57 months, the district court granted a downward departure of seven levels on four different bases and thus sentenced Whitmore to 24–months concurrent on all counts. The district court did not abuse its discretion in granting these departures.

### a. Two Level Downward Departure Because Case was Atypical.

██ At sentencing, the district judge determined that because "this defendant's conduct, although considered reckless by the trial jury, was really motivated by his desire to save the Alaska Statebank rather than destroy it," the case fell outside of the heartland of bank fraud cases and therefore a two level downward departure was warranted. The district court stated that "this is not your average, typical bank fraud," and that "what was going on at the Alaska Statebank was from the beginning to end an effort to enhance the bank and in the end a desperate effort to save it."

Based on the evidence presented throughout the trial and at sentencing, and the court's extensive experience with the numerous Alaska Statebank civil and criminal fraud prosecutions, the district court could have permissibly concluded that "this case is out of the mainstream of bank frauds" and that "the effort that was underway here was to-was to salvage the bank-to save it, not destroy it." Although an alternative conclusion based on the evidence presented is plausible, where, as here, there are two permissible views of the evidence, "the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 573–74. Especially given the high degree of deference accorded departure decisions of district courts, "we will not second guess the district court's determination that this case involved an unusual [ ] situation." *Aguirre,* 214 F.3d at 1127.

### b. Two Level Downward Departure Because of Age and Infirmity.

██ Whitmore was 67 years old at the time of sentencing and suffered from a number of infirmities, including HIV, coronary artery disease, and vulnerability to various infections. Although acknowledging that Whitmore's physical situation did *not* amount to an "extraordinary" situation meriting departure, the district court departed downward two levels finding that "given the defendant's age combined with [his] infirmities, I believe that a sentence of forty-six to fifty-seven months is unduly harsh, it is far more punitive than that same sentence would be on a person of middle age." The district court did not abuse its discretion in making this decision.

The district court correctly noted that because of its finding that Whitmore's physical condition was not extraordinary, departure based on ordinary physical ailments would not qualify as adequate grounds for departure. *See* U.S.S.G. § 5H1.4 (1988) (physical condition usually not relevant in determining whether departure is appropriate, but existence of an extraordinary physical impairment may be reason to downward depart). However, the Sentencing Guidelines provided that age may be a basis for downward departure where the defendant is elderly and infirm and where other forms of punishment would be equally efficient. *See*

U.S.S.G. § 5H1.1 (1988). Thus, although in most cases age is not a basis for downward departure, the district court's decision in this case that age, in combination with Whitmore's disabilities, warranted such a departure was not an abuse of discretion.

### c. Two Level Downward Departure Because Whitmore was Deprived of Professional Livelihood.

The district court found that because Whitmore was "deprived of his professional livelihood," an additional two level downward departure was warranted. The court determined that "as a consequence of the failure of Alaska Statebank and the institution of these charges some six years ago, the defendant, for all practical purposes, was deprived of his professional livelihood." The "very slow development" of the case against Whitmore "didn't just cost Mr. Whitmore his job at Alaska Statebank, it cost him his profession." According to the court, Whitmore lost what could have been "the six to eleven most productive years of his life as far as earning capacity." The court granted a two level downward departure, concluding that this destruction of "professional capacity" and "ordinary livelihood" constituted "a pretty serious punishment already inflicted and carried out ... and one that's likely to be permanent."

With the exception of the factors listed in the Guidelines as improper bases for departure, sentencing courts have discretion to determine what factors warrant departure in a particular case. *See Caperna,* 251 F.3d at 830. In *Koon,* a case involving the "willful violations of rights under color of law" by several police officers, the Supreme Court held that the district court had abused its discretion in partially basing its departure decision on the collateral employment consequences that the police officers would suffer as a result of their convictions. *Koon,* 518 U.S. at 110. Although the Court concluded that "it is not unusual for a public official who is convicted of using his governmental authority to violate a person's rights to lose his or her job and to be barred from future work in that field," the Court refused to categorically exclude the effect of conviction on a career as a possible basis for departure. *Id.*

The district court in this case felt departure was warranted not only because of the potential employment consequences that Whitmore would face as a result of his conviction, but also because of the employment consequences he had already suffered as a result of the "slow development" of the case against him. The prosecution had been instituted over six years before the completion of the trial and Whitmore was deprived of his "professional livelihood" during that entire period. Given that district courts are " 'particularly suited' in determining whether a factor makes a case unusual because they are' informed by [their] vantage point and day-to-day experience in criminal sentencing," *Aguirre,* 214 F.3d at 1127 (citing *Koon* at 98), the district court did not abuse its discretion in determining that the "particular circumstances" of this case warranted a downward departure, *Koon,* 518 U.S. at 109.

### d. One Level Downward Departure Because of Potential For Harsher Confinement Based on Needs of Medical Condition.

The district court departed downward one level based on its finding that, because of the need to accommodate Whitmore's infirmities, "incarceration of Mr. Whitmore is most likely to take place in a federal medical facility of a substantially higher degree of confinement and security

than ... he would be subject to were he well." While the district court found that, based on his convictions and sentence, Whitmore would likely be incarcerated "at the lowest type of security facility ... of the Bureau of Prisons," it concluded that it had "serious doubts that-that his medical situation ... can or would be adequately taken care" of in the type of facility that he would have been sent to.

Although evidence in the record could have supported the conclusion that the Bureau of Prisons had the staff and facilities to accommodate Whitmore's conditions at an institution commensurate with his security considerations, the district court's "vantage point and day-to-day experience" with the particularities of this case and with sentencing under the guidelines support our holding that the district court's decision is plausible in light of the record viewed in its entirety. The district court thus did not abuse its discretion in departing downward one level on this basis.

## III. DEFENDANT SMITH

### A. *Factual Background.*

#### 1. *The Vozar Loan.*

Derrell H. Smith was President of ASB and a member of its Board of Directors. Smith was in need of a personal loan in the sum of $285,000, $200,000 of which he borrowed legally from ASB. For the remainder, Smith obtained a "nominee loan" from ASB through his friends and customers, the Vozars. A nominee loan is a loan made in the name of another that hides the true borrower's beneficial interest in the loan. *See Wolf,* 820 F.2d at 1501. The loan application submitted by Sandra Vozar stated that the purpose of the loan was "working capital for real estate investments" when in reality the purpose was to give the funds directly to Smith. Although the loan papers made no reference to Smith's involvement with the loan, Smith claims that bank officials knew that he was the true beneficiary of the loan. Once the loan was approved, Sandra Vozar forwarded the full amount of the loan to Smith. All repayments on the loan came from Smith through another bank.

#### 2. *The Proffer and Plea Agreement.*

In the course of the FBI investigation of ASB, the Bureau obtained several examination reports. Included were an FDIC "write-up" of the Vozar nominee loan, documents in support of that report, and all of the exhibits later presented to the grand jury. During this period, the FBI also interviewed all of the witnesses who later testified at trial.

After Smith's first trial ended with a hung jury as to most of the counts against him, the parties entered into a proffer agreement in 1994. A June 1994 letter memorialized the government's intention to offer a plea to two counts based on Smith's cooperation under the proffer. Smith agreed to the terms of an amended proffer and was debriefed by the government over a five-day period. Thereafter, Smith entered into a plea agreement with the government that provided "[t]he parties agree that any statements or information provided ... pursuant to the defendant's cooperation under this agreement, and any evidence derived therefrom, shall not be used against the defendant in any criminal proceeding." However, the government agreed to delay the filing of the plea agreement until the final indictment against Smith had been returned. Smith testified for roughly two days before the grand jury and provided some testimony regarding the Vozar loans.

Before the government filed the plea agreement with the court, Smith reneged on the plea agreement and was indicted with the other directors. Before trial,

Smith successfully moved to sever the Vozar loan counts from the other counts on which he had been indicted.

### 3. *Immunized Testimony at Whitmore Retrial.*

The government dismissed all counts against Smith, except the two Vozar loan counts, when Smith gave compelled testimony at Whitmore's retrial in 1999 under a grant of statutory immunity. *See* 18 U.S.C. § 6002. During his testimony, Smith recanted nearly every statement that he had made at the grand jury five years earlier. No questions were asked of Smith concerning the Vozar loan during the retrial.

### 4. *Kastigar and Zielezinski Hearings.*

Prior to his own trial, Smith filed a motion challenging the use of his immunized trial testimony under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).[2] The government provided affidavits listing its evidence and the independent sources of that evidence. Smith then filed a motion to dismiss the indictment under *United States v. Zielezinski*, 740 F.2d 727 (9th Cir.1984), based on the fact that the same grand jury that had heard his grand jury testimony had also indicted him.[3] Smith argued that because his failed plea agreement was introduced to the grand jury during his testimony, the entire proceeding against him was thus tainted. The government responded with additional affidavits and exhibits. The district court held a hearing on both motions on March 23, 2000, and

required all relevant parties to be available for examination and cross-examination.

As to Smith's *Kastigar* claim, the court stated that the government had made the necessary showing that Smith's immunized trial testimony was not used to assist the development of the case against Smith and that the government had independent evidentiary sources for Smith's case. The court found that the government had independent sources for the indictment, as well as for the case against Smith, based on the FDIC inquiry into ASB, bank documents, and FBI interviews of bank employees that occurred before Smith was ever approached.

As to Smith's *Zielezinski* claim, the court rejected Smith's argument that the grand jury's indictment was tainted since, among other things, the government had established an independent source of evidence for the indictment and the testimony was given over seven months before the indictment was handed down. Although the district court noted that the government had not warned the grand jury against using Smith's immunized testimony in making its determination, the court concluded that it was "[u]npersuaded by the evidence before [it] that the government's conduct in this case [in] any way threatened the integrity of the grand jury process."

### B. *Analysis of the Issues on Appeal.*
#### 1. *Smith's Claims Regarding the Plea Agreement.*

Smith contends that the district court erred when it failed to find that the plea

---

2. Under *Kastigar*, 406 U.S. at 460, the government is required to prove, by a preponderance of the evidence, that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."

3. Under *Zielezinski*, 740 F.2d at 733–34, where the same grand jury that hears a person's immunized testimony then indicts that person, a *Kastigar*-style hearing is required to determine whether grounds for the indictment independent of the immunized testimony exist.

agreement superceded the prior letter-form proffer agreement or granted retroactive derivative use immunity to statements made under that proffer. We review the district court's interpretation of the terms of a plea agreement for clear error, but the application of legal principles involved in this interpretation is reviewed de novo. *See United States v. Anthony,* 93 F.3d 614, 616 (9th Cir.1996). Findings regarding the terms of a plea agreement are subject to the clearly erroneous standard of review. *See United States v. Clark,* 218 F.3d 1092, 1095 (9th Cir.), *cert. denied,* 531 U.S. 1057, 121 S.Ct. 668, 148 L.Ed.2d 569 (2000).

The district court held that "the government's rights under the proffer agreement ... survived the failure of the plea agreement." The court reasoned that "the government would have been within its rights to use the proffer information after the plea agreement failed, because the proffer ... specifically contemplated the possibility that there might not be a plea agreement."

The proffer agreement stated that "[t]he government may make derivative use of, and may pursue, investigative leads suggested by the statements made by Mr. Smith." After the proffer debriefing, the government and Smith entered into a subsequent plea agreement which provided that "[t]he parties agree that any statements or information provided ... pursuant to the defendant's cooperation under this agreement, and any evidence derived therefrom, shall not be used against the defendant in any criminal proceeding." The district court did not clearly err in finding that the government's rights under the proffer were not extinguished and in

finding that Smith's statement under the proffer were not given retroactive immunity.[4]

■ First, the plea agreement did not supercede the original proffer agreement. The plea agreement in this case failed as a result of Smith's decision not to abide by his plea bargain. In the end, Smith chose *not* to enter into a binding plea agreement with the government—he was indicted with the other defendants. While Smith points to *United States v. Thornton,* 197 F.3d 241, 253 (7th Cir.1999), to support his claim that "proffer letters ... seem of scant relevance at trial when a subsequent, superceding plea agreement has been reached," Smith fails to realize that the *Thornton* court was addressing the relevance of proffer letters in relation to *successful* plea agreements. Because the plea agreement in the case at bar did not survive, it could not "supercede" any other agreements.

■ Second, while ambiguities in plea agreements should be construed in favor of the defendant, *see United States v. De la Fuente,* 8 F.3d 1333, 1338 (9th Cir.1993), there was no language in the plea agreement dictating or even inferring that such retroactive use immunity would apply. As we stated in *United States v. Lipkis,* 770 F.2d 1447, 1450 (9th Cir.1985), "[a]bsent a specific grant by the United States Attorney, the statements lack immunity as a matter of law."

Here, the plea agreement which the government offered Smith did not grant immunity to statements made under the proffer—rather, it stated that information provided "pursuant to the defendant's cooperation" with the plea agreement would

---

4. Smith contends that the district court erred in finding that the government did not make derivative use of the proffer. Regardless of whether statements from the proffer were ac-

tually used in this way, the government had the authority under the proffer agreement to do so. Smith's claim is thus without merit.

not be used against the defendant in any criminal proceeding. Clearly, information received as a result of the proffer, *before* the plea agreement was even created, was not provided "pursuant to" the subsequent plea agreement. Thus, the district court did not clearly err in determining that retroactive immunity did not apply to the proffer.

### 2. Smith's Claims Regarding the Improper Use of Immunized Testimony.

■■■ Smith claims that the district court erred in finding that the government did not improperly use Smith's grand jury and immunized trial testimony in preparing its case against him. We review a district court's finding that the government has established an independent source for its evidence for clear error. *See United States v. Crowson*, 828 F.2d 1427, 1429 (9th Cir.1987). The district court's decision that the government had established an independent source for the evidence used at Smith's trial was not clearly erroneous.

Smith was granted formal use immunity for his testimony under 18 U.S.C. § 6002, which proscribes both the direct and indirect use of any information obtained during compelled testimony against the person giving that testimony. *See United States v. Mapelli*, 971 F.2d 284, 287 (9th Cir.1992). "This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing the investigation on a witness as a result of his compelled disclosures." *Kastigar*, 406 U.S. at 460. Under *Kastigar*, the government is required to prove, by a preponderance of the evidence, that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* "This court has permitted the government to meet its burden of proof as to the existence of independent, prior sources through affidavits." *United States v. Montoya*, 45 F.3d 1286, 1292 (9th Cir.1995) (citing *Crowson*, 828 F.2d at 1429).

The district court held a hearing on this matter, as required under *Zielezinski*, at which the government presented affidavits and documentary exhibits, and at which its attorneys and other witnesses were available for examination. The government's witnesses stated through affidavits that because of the ongoing investigation into this matter, all of the documents and witnesses that it was planning to use against Smith had been obtained before Smith provided any immunized testimony. In fact, the evidence had been obtained even before the government had approached Smith about the initial proffer. The government further stated that it determined what evidence and witnesses would be needed based on the face of the documents themselves.

Rather than providing solely conclusory statements denying use of the immunized evidence, *see Montoya*, 45 F.3d at 1292 (good faith allegation that the evidence is not the fruit of immunized testimony is not sufficient), these affidavits retraced the investigation and showed what information had been obtained from the FDIC investigation and interviews with bank employees before Smith was ever approached. Based on this evidence, the district court did not clearly err in finding that the government had met its burden of proof on this issue. *See, e.g., Crowson*, 828 F.2d at 1430–31 (documents, as well as fact that investigation into substantive offenses had been substantially completed by the time of immunized testimony, supported court's finding of prior independent source for evidence); *Montoya*, 45 F.3d at 1295 (decla-

rations filed by government that provided details of investigation based on prior information were sufficient to support showing of independent sources).

Smith further contends that the district court's finding was erroneous based on the admission of a government prosecutor that she had "digested" Smith's grand jury testimony. "The focus of the inquiry under *Kastigar* ... is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant." *Crowson*, 828 F.2d at 1430. While it may be true that the government officials involved in Smith's trial were aware of statements made during the immunized testimony, their affidavits and exhibits at the hearing adequately demonstrated that the evidence they were using was derived from sources independent of such testimony.

Thus, the government satisfied its burden by establishing independent sources for the evidence used against Smith. Indeed, the prosecutor noted that since Smith had not testified at Whitmore's trial about the Vozar loans, the only counts on which he was being tried, she could not "even think of how [she] could use [that testimony] to obtain evidence that would be admissible in the nominee loan trial."

### 3. *Smith's Claim that the Indictment Was Tainted.*

Smith claims that the district court erred by finding that the indictment was not tainted by use of the same grand jury to indict him that had heard his immunized testimony and in finding that credibility concerns were not relevant to this question. We review for clear error a district court's finding that the government's sources of evidence were independent of the defendant's immunized testimony. *See id.* at 1429.

In *Zielezinski*, 740 F.2d at 733–34, we declined to establish a *per se* rule prohibiting a grand jury from indicting any witness who had testified before it. Instead, we held that when the same grand jury that hears a person's immunized testimony then indicts that person, a *Kastigar*-style hearing is necessary to determine the independent grounds of the indictment. "[A] good faith allegation that the evidence is not the fruit of immunized testimony is not sufficient; the Government must show how it acquired all of the evidence." *Montoya*, 45 F.3d at 1292 (citing *Block v. Consino*, 535 F.2d 1165, 1169 (9th Cir.1976)). The government presented sufficient evidence to satisfy this burden.

The government's affidavits, exhibits, and testimony at the pre-trial hearing showed by a preponderance of the evidence that the information it used to indict, as well as to try, Smith had been obtained prior to and independent of the grand jury testimony. The court found that "the government had access and had in hand before the immunized testimony the results of an FDIC inquiry. They had bank documents. They had the benefit of interviews with other bank employees, and they had the benefit of one or more interviews with [the Vozars]." Smith had an opportunity at the hearing to contest this proof and to offer his own evidence to the contrary. The evidence sufficiently showed how and from where the government acquired its evidence. *See Block*, 535 F.2d at 1169.

Presenting to a new grand jury is best where feasible, but a strong cautionary admonition not to consider immunized testimony must always be given when the same grand jury must be used. Thus, while the United States Attorney should admonish the grand jury not to use a witness's immunized testimony when de-

ciding whether to return an indictment against that individual, the district court did not clearly err in determining on this record that Smith's indictment was not tainted given the circumstances and timing of the indictment in this case. As the court noted, in this case it was "improbable that the federal grand jury had Mr. Smith's immunized testimony in mind when it determined to indict him," because, among other things, the immunized testimony was given over seven months prior to the indictment.

■ Further, the district court did not err in finding that *Zielezinski* did not require it to dismiss an indictment where the witness' credibility may have become an issue, as long as there was an independent evidentiary basis to support the indictment. The focus of *Zielezinski* is to protect the integrity of the judicial process by ensuring that the prosecutors rely on independent, non-immunized sources in pursuing their cases. *See Zielezinski,* 740 F.2d at 733–34. Although we stated in *Zielezinski* that an "assessment of credibility can taint an indictment," *id.,* we have never held that the potential existence of a negative credibility assessment requires dismissal of an indictment. This is especially so where the record does not even suggest that the grand jury's decision was based on an assessment of Smith's credibility. The district's court's decision not to dismiss the indictment on this basis was not clearly erroneous. *See United States v. Zielezinski,* 756 F.2d 1448 (9th Cir.1985) (on appeal after remand, holding district court did not clearly err in upholding conviction where no evidence in record that grand jury's decision was based on credibility assessment).

4. *Smith's Claim Regarding Disclosure of the Grand Jury Transcript.*

Smith contends that the district court erred in refusing to allow disclosure of Special Agent Henderson's entire grand jury transcript. Although the government had already provided Smith with all of the FBI agent's testimony relevant to the counts with which Smith was charged, Smith contends that the remainder of the transcript was necessary to prove that the government had used his immunized testimony and to prove that his credibility had been attacked during the grand jury proceedings.

■ We review a district court's decision regarding the release of grand jury transcripts for an abuse of discretion. *See United States v. Plummer,* 941 F.2d 799, 806 (9th Cir.1991) (citing *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 223, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)). The district court may release grand jury transcripts, and thus "lift the secrecy of grand jury proceedings," if it determines (1) that the desired material will avoid a possible injustice, (2) that the need for disclosure is greater than the need for continued secrecy, and (3) that only the relevant parts of the transcript will be disclosed. *Id.* Disclosure should be ordered only where the party seeking the transcripts has demonstrated that a "particularized need exists ... which outweighs the policy of secrecy." *United States v. Walczak,* 783 F.2d 852, 857 (9th Cir.1986); *Dennis v. United States,* 384 U.S. 855, 870, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). This standard of particularized need is narrowly applied to insure that only relevant grand jury testimony is made available to defense counsel. *See United States v. Kim.* 577 F.2d 473, 478 (9th Cir.1978).

In *Plummer,* 941 F.2d at 806, we held that the district court did not err when it refused to disclose the entire grand jury transcript to the defendant for purposes of determining whether the government had

breached its immunity agreement. We concluded that by providing the defendant with the parts of the transcript relevant to his claims, the district court properly balanced the defense need for the testimony with the need to preserve the secrecy of grand jury proceedings.

■ Here, the government had provided Smith with all of Agent Henderson's testimony on the two counts on which he was being tried. Since the district court had determined that credibility was not the relevant consideration under *Zielezinski,* and since the relevant portions of the transcript had already been provided to Smith, the district court's determination that Smith's need for the full transcript did not outweigh the need to protect the secrecy of the proceedings was not an abuse of discretion.

### 5. *Smith's Claims Regarding Excluded Witness Testimony.*

Smith contends that the district court erred in refusing to admit the testimony of Ron Brown ("Brown"), his only witness, to impeach the testimony of a government witness, ASB Vice–President, Margaret Oldham ("Oldham"). Smith argues that Brown's testimony was necessary to impeach Oldham, who had testified she did not know until after ASB had closed that the proceeds of the Vozar loan went to Smith. The defense proferred that Brown, Oldham's replacement at ASB, would testify that sometime between 1987 and the closing of ASB in 1989, Oldham had told Brown that the proceeds of the Vozar loan had been disbursed to Smith. Smith claims that this testimony was relevant to his defense that ASB was aware

that he was the true beneficiary of the loan.

■ We review the district court's evidentiary ruling for an abuse of discretion. *See United States v. Murillo,* 255 F.3d 1169, 1174 (9th Cir.2001). The district court ruled that Brown's testimony was inadmissible because Smith had failed to lay the proper foundation as required under Federal Rule of Evidence 613(b).[5] The court ruled that the defense had not given Oldham "a sufficiently specific opportunity to recall what it is you're going to zing her on through another witness, as in asking, didn't you talk to Ron Brown about this situation." Smith's attorney had simply reaffirmed that Oldham did not know that the proceeds of the Vozar loan were going to Smith and then asked, "So between March 1987 and when the bank closed in February of '89, you never told anybody in the bank that you knew that the loan proceeds went to Mr. Smith?" Oldham replied, "No." Oldham was excused shortly thereafter.

The foundational prerequisites of Rule 613(b) require only that the witness be given an opportunity, at some point, to explain or deny the prior inconsistent statement and that the opposing party be given the opportunity to examine the statement. *See United States v. Young,* 86 F.3d 944, 949 (9th Cir.1996); *United States v. McLaughlin,* 663 F.2d 949, 953 (9th Cir.1981). In *Young,* 86 F.3d at 949, we reversed the district court's determination that, because the defense had not *first* provided the witness with an opportunity to explain the inconsistent statement, the foundational prerequisites of Rule 613(b) had not been satisfied. While the initial

---

**5.** Federal Rule of Evidence 613(b) provides in relevant part:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

questioning of the witness had not afforded the witness an adequate opportunity to explain the statement, the government would have been free to re-call the witness and "give him an additional opportunity to explain or deny the statement attributed to him." *Id.* Similarly, in *McLaughlin,* 663 F.2d at 953, we held that the foundational requirements of Rule 613(b) had been satisfied where the witness was reminded during his initial examination of the time, place, and persons present at the time the prior inconsistent statement was made, and where the government would have been free to re-call the witness and give him an additional opportunity to explain the statement.

Smith's case can be distinguished from *Young* and *McLaughlin.* In both cases, we concluded that the foundational prerequisites were satisfied where the government could have re-called the witness to explain or deny the prior inconsistent statement. *See Young,* 86 F.3d at 948; *McLaughlin,* 663 F.2d at 953. This was not an option for the government in this case. Oldham, who did not even live in Alaska, had been excused and flew home before Brown had been called to the stand. Neither Oldham nor the government was given an adequate opportunity to explain or examine the statement under these circumstances. The district court therefore did not abuse its discretion in disallowing the testimony of Brown.

Smith further contends that the statements should have been admitted under Federal Rule of Evidence 404(b) as evidence that Oldham, a member of the Board, knew that Smith was the true recipient of the loans. Smith contends that proof of such knowledge could negate the fraudulent intent required for the misapplication charge.

Federal Rule of Evidence 402 provides that "[e]vidence that is not relevant is not admissible." Smith concedes that knowledge or consent by the Board does not constitute a defense to the charge of making a false statement. Therefore, evidence of Oldham's knowledge would not be relevant to that count. *See United States v. Blumenthal,* 945 F.2d 280, 284 (9th Cir.1991). Further, "[the Board's] knowledge, ratification, and consent are not *per se* defenses to the charge [of misapplication]. Instead these are evidentiary matters that may be considered as part of the defense that there was either no willful misapplication or no intent to injure the bank." *Unruh,* 855 F.2d at 1368.

The district court properly considered Smith's position, his involvement in and control over the loan processes, the fact that Oldham's statement may not have been made, if at all, until after the loan had been approved, and the fact that "[r]eview by the board is a particularly dubious basis for exculpating the [defendant where] the evidence showed that [the defendant] was the moving force behind the board of directors." *Id.* It did not abuse its discretion in refusing to admit the testimony of Brown to show that Oldham, one member of the Board of Directors, may have known the true purpose of the Vozar loans.

## IV. CONCLUSION

The convictions and sentences of Ralph E. Whitmore, Jr. and H. Derrell Smith are **AFFIRMED.**