**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

FLORENCE A. WHITE EAGLE,
*Defendant-Appellant*.

No. 11-30352

D.C. No.
4:11-cr-00032-
SEH-1

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
November 6, 2012—Portland, Oregon

Filed July 5, 2013

Before: Kenneth F. Ripple[*], M. Margaret McKeown,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge McKeown

---

[*] The Honorable Kenneth F. Ripple, Senior Circuit Judge for the U.S. Court of Appeals for the Seventh Circuit, sitting by designation.

**SUMMARY**[**]

**Criminal Law**

The panel affirmed in part and reversed in part a criminal judgment in a case arising out of the involvement by the Bureau of Indian Affairs Superintendent at the Fort Peck Indian Reservation in a scheme to obtain money from a tribal credit program.

Reversing convictions on counts charging conspiracy to convert tribal credit program proceeds (18 U.S.C. § 371) and theft and conversion from an Indian Tribal Organization (18 U.S.C. §§ 1163, 2), the panel held that the government's misapplication theory, predicated at best on an employer directive and a civil regulation, cannot support a conviction; and that the government's embezzlement and conversion theories also fail because the defendant never controlled or had custody of the funds that she later borrowed.

Affirming a bribery conviction (18 U.S.C. § 201(b)(2)), the panel held that a jury could easily infer a quid pro quo and had ample evidence to conclude that the defendant's actions were "corrupt."

Because the government did not show that the defendant violated a specific duty to report credit program fraud, the panel reversed her conviction of concealment of public corruption (18 U.S.C. § 1001(a)(1)).

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel reversed a conviction for public acts affecting a personal financial interest (18 U.S.C. § 208(a)(1)) because the connection between the payment of a BIA Administrative Officer's fraudulent nominee loans and the defendant's alleged financial interest is remote and speculative.

The panel held that there was sufficient evidence to support the defendant's conviction of misprision of a felony (18 U.S.C. § 4).

The panel rejected the defendant's contention that her convictions for public acts affecting a financial interest and misprision of a felony would violate her Fifth Amendment right to avoid self-incrimination because each charge relied on her duty to report criminal activity that would have exposed her to prosecution. The panel reasoned that the connection between the defendant's loan modification and the BIA Administrative Officer's use of nominee borrowers is too remote to implicate the defendant's Fifth Amendment rights.

The panel held that the district court erred at sentencing in its application of U.S.S.G. § 2C1.1(b)(2), when it appeared to value the loan modification using standard "loss" calculations instead of focusing on the "value of the benefit" the defendant received. The panel explained that any sentencing adjustment must be based on the value of the loan modification as a bribe, and remanded for further proceedings.

**COUNSEL**

Steven T. Potts (argued), Great Falls, Montana, for Defendant-Appellant.

Carl E. Rostad (argued), United States Attorney's Office for the District of Montana, Great Falls, Montana, J. Bishop Grewell, United States Attorney's Office for the District of Montana, Billings, Montana, for Plaintiff-Appellee.

---

**OPINION**

McKEOWN, Circuit Judge:

Florence White Eagle appeals her conviction and sentence on six counts arising out of her involvement in a scheme to obtain money from a tribal credit program: (I) conspiracy to convert tribal credit program proceeds in violation of 18 U.S.C. § 371; (II) theft and conversion from an Indian Tribal Organization in violation of 18 U.S.C. §§ 1163, 2; (III) bribery in violation of 18 U.S.C. § 201(b)(2); (IV) concealment of public corruption in violation of 18 U.S.C. § 1001(a)(1); (V) public acts affecting a personal financial interest in violation of 18 U.S.C. § 208(a); and (VI) misprision of a felony in violation of 18 U.S.C. § 4. Without a doubt, White Eagle turned a blind eye to fraud and facilitated its cover up. The difficulty for the prosecution is that, in the main, the crimes charged did not fit the facts. We affirm White Eagle's convictions on Counts III and VI (bribery and misprision of a felony), but reverse the convictions on Counts I, II, IV, and V, and remand for resentencing.

## BACKGROUND

White Eagle was the Bureau of Indian Affairs ("BIA") Superintendent at the Fort Peck Indian Reservation. The BIA is the federal government's trustee for lands on Fort Peck in northeastern Montana, which is home to the Assiniboine and Sioux Tribes. Until early 2008, the BIA oversaw the Fort Peck Credit Program ("Credit Program"), which provided a supplemental source of credit to tribal members and was intended to "rais[e] the economic status of members of the Tribes to a point where they can look to the same sources of financing as are looked to by other citizens." One of White Eagle's duties was to sign loan documents for Credit Program loans that pledged trust assets as collateral.

The Credit Program was staffed with four tribal employees and two BIA employees—a loan specialist and a loan assistant. The four tribal employees were supervised by the two BIA employees, who, in turn, were supervised by Toni Greybull, the BIA Administrative Officer. White Eagle was Greybull's immediate supervisor and the two women worked together at Fort Peck for many years.

Greybull was a central participant in a fraudulent scheme to advantage Credit Program employees. The setup was not particularly complicated—Credit Program employees obtained loans by filing applications in the names of "nominee," or stand-in, relatives and then splitting the proceeds amongst themselves. To avoid the three-person Credit Committee tasked with application review and approval, Greybull approved many of the loans herself. This scheme was extensive: an Office of the Inspector General ("OIG") audit revealed that of the approximately $1.6 million loaned by the Credit Program, around $1.2 million went to

Credit Program employees and their stand-in family members.

Greybull died in March 2008, leaving behind a number of unpaid loans in others' names. In May 2008, Greybull's sister Linda Christiansen approached White Eagle with documentation for nominee loans that Greybull had taken out in Christiansen's name as well as in the name of Arthur Greybull, III (Toni Greybull's son). Christiansen requested that the loans be repaid out of Greybull's life insurance. Apparently worried that inquiries about the loans would lead to an audit that potentially would expose the fraud, White Eagle contacted Greybull's husband Arthur Greybull Jr. and falsely informed him that Toni Greybull (not the nominee borrowers) had outstanding loans with the Credit Program. Greybull's husband then paid the loans with money from Greybull's life insurance.

Greybull was not the only beneficiary of the loan program. White Eagle also obtained loans from the Credit Program, though not through the use of nominee borrowers. In 2002, she took out a short-term loan of $2,000, and in February 2007 she obtained a long-term loan for $5,050. White Eagle made payments as required under the terms of the loans. The long-term loan was modified twice to allow borrowing of additional funds: in January 2008 the loan was increased by $15,000, and in June 2009 it was increased by another $5,050. These modifications were approved by the Credit Program's Credit Committee, not Greybull. Although the government does not allege the loans were fraudulently procured, White Eagle's long-term loan modification was contrary to specific directives she had received. When the BIA regional director discovered in late 2007 that White Eagle had taken out loans, he told her to pay them off and

discontinue participation in the Credit Program due to the conflict of interest. The government argues that White Eagle's Credit Program loans also violated the prohibition on holding financial interests that conflict with conscientious performance of duty. *See* 5 C.F.R. § 2635.101(b)(2).

At trial, the government argued that Greybull arranged the 2008 loan modification as quid pro quo for White Eagle's assistance in dealing with possible discovery of the nominee loan scheme triggered by Greybull's mother Patricia Menz. In September 2007, Menz visited the Credit Program offices to pay off a loan she had personally taken out and discovered, to her surprise, that other loans had been taken out in her name and without her knowledge or consent. The Credit Program employee who assisted Menz had obtained fraudulent loans himself and knew that Greybull had obtained fraudulent loans. He directed Menz to speak to Greybull for answers to her questions. Instead, and without telling Greybull or others involved in the scheme, Menz contacted the OIG and reported the loan irregularities.

Menz did not complain to the BIA or the Credit Program, and there was no official reason for White Eagle to address her concerns. Nonetheless, in December 2007, White Eagle sent Menz a letter on BIA letterhead falsely assuring her that she owed nothing because the loans had been erroneously listed in her name and had also been paid off. The day before White Eagle sent the letter, she had applied for the $15,000 increase in her long-term loan. Although the loan was approved by the Credit Committee, the government presented evidence that Greybull fast-tracked its approval, even prevailing upon Credit Program staff to release a hold on White Eagle's account. The government also argued that the loan issued on unusually favorable terms. Under its theory,

the fast-tracked and favorable loan modification was a payoff for White Eagle's assistance in the coverup.

The fraudulent scheme was uncovered during a 2009 audit conducted by the Fort Peck Tribes. The audit determined that fraud had been taking place since at least the early 1990s, with participation by six Credit Program employees. The investigation also identified Christiansen and Greybull III (the nominal recipients of the loans paid off by Greybull's life insurance) as participants.

White Eagle's prosecution arose out of the audit. In March 2011, the government charged White Eagle with six counts stemming from her involvement in the fraudulent scheme and the loan modifications. The jury found her guilty on all counts. The district court imposed a sentence of 51 months on Counts I through V, and 36 months for Count VI, to run concurrently. White Eagle appeals her convictions on all counts, as well as the district court's application of the four-level sentencing enhancement based on the value of the bribe.

## ANALYSIS

## I. CONVICTIONS

White Eagle preserved her claim of insufficient evidence by moving for a judgment of acquittal at the close of evidence. Fed. R. Crim. P. 29. We therefore review de novo the sufficiency of the evidence supporting the conviction. *United States v. Tucker*, 641 F.3d 1110, 1118 (9th Cir. 2011). Evidence is sufficient to sustain a conviction if, when construed in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).

**A. Counts I and II: Conspiracy, Theft and Conversion of Indian Tribal Organization Property**

In Counts I and II, the government alleged that White Eagle and Greybull conspired to embezzle or convert Credit Program funds. According to the government, the object of the conspiracy was White Eagle's $15,000 loan modification. We note that these charges are narrowly targeted, particularly in comparison to the wide-ranging nominee borrower scheme. Counts I and II focus on Menz's discovery of the loans in her name, White Eagle's assistance in the attempted cover-up, and White Eagle's receipt of a loan modification—events beginning in late 2007, long after Greybull's nominee scheme occurred was implemented.

The jury was properly instructed that conspiracy required "an agreement between two or more persons" and "a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy." Ninth Circuit Model Criminal Jury Instruction No. 8.20. The government argues that "[t]he jury could infer an agreement" from Greybull's loans and White Eagle's attempt to cover up the fraudulent activity. However, it does not argue that Greybull's loans, which predated the alleged conspiracy, were its object. Instead, under each of the misappropriation theories, *White Eagle's* loan modification is touted as the object of the conspiracy: "obtaining monies that her supervisor had prohibited" (misapplication) or using "her lawful authority over the funds

to gain what was an otherwise unauthorized possession of the funds" (embezzlement and conversion). Hence, we analyze White Eagle's loan modification, not Greybull's fraudulent nominee loans, as the basis for the convictions on Counts I and II.

The government presented no evidence that White Eagle defrauded the Credit Program or that the applications for her long-term loan and subsequent modifications were inaccurate or incomplete. *See Carlos-Blaza v. Holder*, 611 F.3d 583, 588 (9th Cir. 2010) (analyzing charge for misapplication of bank funds and holding that "a conviction for misapplication . . . necessarily involves intent to defraud"); *United States v. Dreitzler*, 577 F.2d 539, 546 (9th Cir. 1978) (to show misapplication, the government must prove that "the bank's funds were disbursed under a false record"). Unlike core participants in the nominee borrower scheme, White Eagle did not use nominee borrowers to surreptitiously gain a personal benefit. *Cf. id.* at 545 (upholding misapplication conviction where defendant "set up bogus loan transactions, presented . . . forged documents to the bank, and received the proceeds of the 'loans' which he used for his [insurance] agency's benefit"). The posture of White Eagle's participation forecloses a conviction under a traditional misapplication theory involving fraud or misrepresentation of some kind.

The government instead tethers its theory to two restrictions affecting White Eagle's participation in the Credit Program. The first restriction is that White Eagle's supervisor in 2007 instructed her not to borrow from the Credit Program; the second, 5 C.F.R. § 2635.101(b)(2), prohibits holding financial interests that conflict with conscientious performance of duty. However, neither

violation of an employer's instruction nor a civil rule by itself supports a conviction for conversion, theft, or misapplication of funds.

This conclusion follows from analogous cases involving prosecutions for misapplication of bank funds under 18 U.S.C. § 656. In *United States v. Wolf*, 820 F.2d 1499, 1505 (9th Cir. 1987), the defendant submitted fraudulent loan applications in the name of stand-in borrowers and additionally failed to make disclosures required by Federal Reserve Regulation O. Despite evidence that the loan applications were fraudulent, we reversed the misapplication conviction because of the "serious risk that the jury would find Wolf guilty of criminal misapplication . . . because he failed to comply with Regulation O," a civil regulation. *Id.*; *see also United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980) ("A conviction, resulting from the government's attempt to bootstrap a series of checking account overdrafts, a civil regulatory violation, into an equal amount of misapplication felonies, cannot be allowed to stand."). "[U]nder the logic of *Christo* and *Wolf*, it is impermissible to use the violation of a civil statute to *ipso facto* 'supply a crucial element' of a criminal offense." *United States v. Eriksen*, 639 F.3d 1138, 1150 (9th Cir. 2011). The government's misapplication theory, predicated at best on an employer directive and a civil regulation, cannot support a conviction here.

The government's embezzlement and conversion theories also fail because White Eagle never controlled or had custody of the funds that she later borrowed. Even though she signed paperwork for loans involving the pledge of trust assets as collateral, the Credit Committee (of which White Eagle was not a member) approved loans before a check would issue.

*See id.* at 1145 (explaining that "[e]mbezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come") (alteration in original; citation and internal quotation marks omitted); *United States v. Andreen*, 628 F.2d 1236, 1241 (9th Cir. 1980) ("[C]onversion encompasses the use of property, placed in one's custody for a limited purpose, in an unauthorized manner or to an unauthorized extent."). Nor does Greybull's shepherding White Eagle's loan modification through the approval process and signing paperwork constitute embezzlement.  In contrast to Greybull's own nominee loans (which circumvented the Credit Committee), White Eagle's loan modification was ultimately approved by the Credit Committee.  Even in the light most favorable to the government, the evidence contradicts an embezzlement or conversion theory.

Because the alleged object of the conspiracy—the loan modification—was not itself criminal, there can be no conspiracy.  *See United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir.2004) (holding that a conspiracy requires an agreement to engage in criminal conduct).  The government cannot bootstrap itself to a criminal conviction simply because White Eagle disobeyed a supervisor's order or contravened a general civil conflict of interest statute.  We reverse White Eagle's convictions on Counts I and II.

## B.  Count III: Bribery

The quid pro quo alleged here is simple.  White Eagle, as BIA Superintendent, helped Greybull cover up her fraudulent scheme; in exchange Greybull helped her obtain a favorable loan modification.  The government was required to prove that: (1) White Eagle "was a public official;" (2) she received

"[some]thing of value . . . in return for . . . being induced to do or omit to do an[] act in violation of [her] official duty;" and (3) she acted "corruptly"—that is, with the "intent to be influenced to perform an act" that violated her official duty." *See* 18 U.S.C. § 201(b)(2)(C); *United States v. Leyva*, 282 F.3d 623, 625-626 (9th Cir. 2002).

White Eagle does not challenge her status as a public official. Instead, she argues that she received nothing of value because Greybull's assistance with the loan modification was unnecessary and that she did not act corruptly because her actions could not have affected the OIG's investigation. White Eagle also challenges the sufficiency of the indictment, which alleges that agreement and payment took place *after* she sent the letter to Menz.

The evidence is consistent with bribery, and surely sufficient under *Jackson v. Virginia*. 443 U.S. at 319 (evidence is sufficient if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (emphasis in original). Upon hearing of Menz's concerns, White Eagle conducted almost no investigation into whether Menz's loans were actually paid, and did not report the issue to her superior. Instead, on December 12, 2007, she wrote a letter to Menz on BIA letterhead falsely assuring her that the loans had been paid off and that they had only erroneously been listed under Menz's name. Only one day earlier, White Eagle had applied for the $15,000 loan modification. The modification appears to have issued on irregular and favorable terms: it included improved repayment provisions, and the documentation did not include a pledge of trust assets as was normally required. Greybull, whose signature appeared on the application, fast-tracked the loan and prevailed upon the Credit Program to release a hold

on White Eagle's account that arose after a borrower for whom White Eagle had co-signed defaulted on a loan.

A rational jury could easily infer a quid pro quo from these facts, concluding that White Eagle wrote Menz a letter to alleviate her concerns and turned a blind eye to the nominee borrower scheme in exchange for Greybull's later assistance in securing a quick and favorable loan modification. Although the loan modification might well have issued without Greybull's involvement, the jury was entitled to find that her assistance was "something of value," particularly given the favorable terms.

White Eagle also argues that she took no corrupt actions because her letter to Menz could not have affected the OIG's response to Menz's complaint. In doing so, she misconstrues the import of the letter—transmitting the letter was corrupt regardless of its impact, as success is not an element of the offense. Moreover, White Eagle failed to report the obviously illegal nominee borrower scheme. *See United States v. Birdsall*, 233 U.S. 223, 231 (1914) (adopting, for bribery purposes, a broad definition of official acts and noting that "[t]o constitute . . . official action, it was not necessary that [the conduct] be prescribed by statute"); *O'Campo v. Hardisty*, 262 F.2d 621, 624 (9th Cir. 1958) (same). The jury had ample evidence to conclude that White Eagle's actions were "corrupt."

White Eagle argues that "[a] person cannot be bribed for a past act" and urges us to reject the indictment because it states that White Eagle agreed to the scheme and accepted the payment in January 2008, *after* she sent the letter to Menz. But the indictment sets no dates in stone. While Count III states that White Eagle agreed to the scheme and received the

loan modification "on or around" January 2, 2008, the evidence in the record is consistent with an agreement between White Eagle and Greybull that predated the December letter to Menz. Moreover, any challenge to the sufficiency of Count III of the indictment is misplaced regardless of any imprecision as to timing. The indictment tracks the language of the bribery statute, contains the elements of the offense, and specifies which of White Eagle's actions violated the law, thus allowing her to avoid another prosecution on the same actions. *See Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Milovanovic*, 678 F.3d 713, 727 (9th Cir. 2012). We affirm White Eagle's conviction under Count III.

### C. Count IV: Falsification, Concealment, or Covering Up of a Material Fact

The district court properly instructed the jury that a conviction under 18 U.S.C. § 1001(a)(1) requires that: (1) the defendant had a duty to disclose material information, (2) the defendant falsified, concealed, or covered up such a fact by trick, scheme, or fraud, (3) the falsified, concealed, or covered up fact was material, (4) the falsification and/or concealment was knowing and willful, and (5) the material fact was within the jurisdiction of the Executive Branch. *See United States v. Varbel*, 780 F.2d 758, 762 (9th Cir. 1986) (indictment alleging concealment in violation of 18 U.S.C. § 1001 failed where there was no duty to disclose); *see also United States v. Moore*, 446 F.3d 671, 677 (7th Cir. 2006). White Eagle challenges the legal sufficiency of her duty to report Greybull's fraud and claims that she did report the fraud to Darryl LaCounte, the BIA Deputy Regional Director.

White Eagle's claim that she reported the fraudulent scheme does not withstand scrutiny. She argues only that she told LaCounte that Greybull's husband had paid the balance of a loan for one of Greybull's relatives. This hardly counts as an actual "report" alerting LaCounte to the fraudulent activity. LaCounte's testimony also contradicts White Eagle's claim that she reported the fraud. He recalled discussing Greybull's husband's payment with White Eagle, but did not remember hearing about Greybull's fraud. LaCounte also testified that he would have reacted to any report regarding fraudulently obtained loans—but he did not investigate or take any actions. The jury was entitled to reject White Eagle's account and credit LaCounte's testimony. We cannot overturn its credibility determinations. *See United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir. 1999) (noting that a jury's credibility finding cannot be reviewed on appeal). We therefore focus our analysis on whether White Eagle's failure to report Greybull's fraud can support a conviction for concealment under 18 U.S.C. § 1001(a)(1).

White Eagle, like all government employees, had a duty to "disclose waste, fraud, abuse, and corruption to appropriate authorities," codified in the Code of Federal Regulations as a "[b]asic obligation of public service." *See* 5 C.F.R. § 2635.101(b)(11). It is not disputed that White Eagle violated this fundamental rule. However, she is not charged with breaching the public trust or failing to perform her duties as a public servant or government employee. Instead, she is charged with fraudulent concealment, a narrower offense under the umbrella of "Fraud and False Statements." 18 U.S.C. ch. 47. Because failing to report fraud in violation of generally applicable ethical principles is not equivalent to

a "false statement," the facts do not support a conviction under § 1001(a)(1).[1]

As other circuits have recognized, a conviction under § 1001(a)(1) is proper where a statute or government regulation requires the defendant to disclose specific information to a particular person or entity. *See United States v. Tobon-Builes*, 706 F.2d 1092, 1096 (11th Cir. 1983). So, for example, when a defendant submits a report that omits particular information that by law must appear in the report, a conviction for concealment is proper. *See United States v. Muntain*, 610 F.2d 964, 971–72 (D.C. Cir. 1979). The same holds true when a defendant responds to specific questions on a particular topic. *See United States v. Stewart*, 433 F.3d 273, 318 (2d Cir. 2006) (holding that SEC investigator's specific questions regarding another individual's stock trades created a duty to disclose information about those trades).

In these situations, the defendant's silence is akin to an affirmative misrepresentation, and therefore logically falls within the scope of § 1001's prohibition on false and fraudulent statements. *See United States v. Mubayyid*, 658 F.3d 35, 70-71 (1st Cir. 2011) ("[B]y filing the false Form 990s, which he signed under penalty of perjury, Mubayyid did not passively fail to disclose material facts; he engaged in an affirmative act of concealment. . . . His conduct is therefore sufficient grounds for a conviction under § 1001(a)(1).") (citation omitted). Similarly, if a financial institution fails to report particular transactions as required by law, its silence is effectively a statement that no such transactions took place. *Cf. United States v. Puerto*, 730 F.2d

---

[1] White Eagle's failure to report Greybull's felony was charged in Count VI (misprision of a felony) and was not a part of this Count.

627, 633 (11th Cir. 1984) (holding that a defendant is guilty of concealment of a material fact when he causes either an inaccurate currency transaction report or no currency transaction report to be sent to the Internal Revenue Service).

We can identify no analogous "silent statement" by White Eagle. It is true that White Eagle concealed Greybull's loans by writing a false letter to Menz claiming that the loans had been paid off and by inducing Greybull's husband to pay the loan balances with life insurance proceeds. However, neither act involved an affirmative false or misleading statement to the government. The government argues that White Eagle further concealed the fraud by informing LaCounte that Greybull's nominee loans had been paid off, but not telling him that they had been fraudulently obtained in the first place. But that incomplete report—while misleading—did not contravene a specific reporting duty. White Eagle's partial disclosure made no representation, explicit or implicit, as to the existence of fraud in the Credit Program. Her acts may be improper and unethical, but they are not sufficient for a concealment conviction under § 1001(a)(1).

The D.C. Circuit's treatment of an analogous issue in *United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008), is instructive. The court overturned a conviction under § 1001(a)(1) that, like here, arose out of an alleged violation of 5 C.F.R. § 2635.101(b)(11)*. Id*. at 959. The defendant, a GSA employee, sought ethical advice about participating in golf trip sponsored by Jack Abramoff, but did not disclose Abramoff's business before the GSA in his request for the ethics opinion. *Id.* at 960. The government argued that the defendant's omission of this relevant detail breached his duty to disclose under the regulation and other ethical principles. *Id.* at 964. The court acknowledged the ethics rules required

disclosure relating to corruption, but found that the relationship between those requirements and the duty to report under § 1001(a)(1) was "tenuous at best." *Id.* It noted that there was "no indication of the particular facts or information" that should be disclosed, and that the regulation contained no indication that it applied to the defendant's conduct. *Id.* at 965. It reversed the conviction under § 1001(a)(1) because there was no duty to disclose. *Id.*

The same reasoning applies here. Although the regulation discusses reporting "fraud" and "corruption," 5 C.F.R. § 2635.101(b)(11), it does not provide specifics on what kind of information should be reported or to whom. Nor does it discuss criminal liability for failure to abide by its provisions. *See Safavian*, 528 F.3d at 964 (Under the Fifth Amendment, "the defendant must have 'fair notice . . . of what conduct is forbidden. . . . [T]his "fair warning" requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendant['s] actions were criminal.'") (first three alterations in original) (citation omitted). Nothing in § 1001(a)(1) or the regulation indicates that a failure to report could effectively be read as a statement that no fraud was taking place. Because the government did not show that White Eagle violated a specific duty to report Credit Program fraud, we reverse her conviction as to Count IV.

**D. Count V: Public Acts Affecting a Personal Financial Interest**

White Eagle was also indicted under 18 U.S.C. § 208(a), the basic criminal conflict of interest statute,[2] based on her alleged concealment of Greybull's fraudulent scheme. According to the government, the concealment furthered White Eagle's own interests because she wanted the loan program to continue so that she could obtain additional future loans and ensure that she kept her job; both would be in jeopardy if the scheme was discovered. Those interests are too remote from White Eagle's acts to sustain a conviction.

Section 208(a) regulates a limited set of "particular matters," generally arising out of discrete matters with a direct impact on the government employee's finances. *See* 5 C.F.R. § 2640.103(a)(1) (listing examples that involve the award and maintenance of government contracts, specific hiring decisions, and use of a particular business's services). Illustrative cases under § 208(a) underscore the link between the conflict and a real, rather than speculative, interest in a particular matter. *See, e.g.*, *United States v. Selby*, 557 F.3d

---

[2] Section 208(a) provides that

> [W]hoever, being an officer or employee of the executive branch . . . participates personally and substantially as a Government officer or employee . . . in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he . . . has a financial interest . . . [s]hall be subject to the penalties set forth in section 216 of this title.

18 U.S.C. § 208(a).

968, 975 (9th Cir. 2009) (per curiam) (employee whose husband earned commission from a software sale to the government had sufficient financial interest to sustain conviction under § 208(a) where she had actively lobbied for increased use of her husband's software); *United States v. Jewell*, 827 F.2d 586, 587 (9th Cir. 1987) (financial interest requirement of § 208(a) was met where the government employee signed invoices authorizing payment to his own company); *United States v. Smith*, 267 F.3d 1154, 1156–57 (D.C. Cir. 2001) (referral of patients to specific mental health clinic to which defendant had loaned money was sufficient under § 208(a)).

The government argued that the "particular matter" underlying this Count was White Eagle's request that Greybull's husband pay off Greybull's nominee loans with the proceeds of Greybull's life insurance. While an employee need not personally stand on either side of an underlying transaction, the link between the employee's interest and the public act must be direct and predictable. *See United States v. Lund*, 853 F.2d 242, 243 (4th Cir. 1988) (applying statute to federal employee's involvement in hiring decision involving a relative). There was no such clear link here.

The connection between the payment of Greybull's fraudulent nominee loans and White Eagle's alleged financial interest is remote and speculative. While White Eagle's acts directly concealed Greybull's fraud, her own interests were further downstream. To find an effect on White Eagle's continued employment and/or her future ability to obtain Credit Program loans, we must assume that discovery of Greybull's fraud would have led to a wide-scale investigation, and one of two outcomes: (1) a change in policy preventing loans to BIA employees that would not

affect White Eagle unless and until she desired *additional* loans; or (2) the conclusion that White Eagle was at fault to a degree justifying her termination. This chain of events requires hypothesis heaped on hypothesis and is not the "close causal link" between the request to pay and the effect on the claimed financial interests. *Selby*, 557 F.3d at 975. Any proposed link is fraught with contingencies, particularly because Greybull's underlying fraud was part of a longstanding scheme that long predated claimed complicity by White Eagle. *See* 5 C.F.R. § 2640.103(a)(3)(i) ("A particular matter will not have a direct effect on a financial interest, however, if the chain of causation is attenuated or is contingent upon the occurrence of events that are speculative."). Accordingly, White Eagle's financial interest in this matter was insufficient under 18 U.S.C. § 208(a). We reverse her conviction on Count V.

### E. Count VI: Misprision of a Felony

Misprision of a felony in violation of 18 U.S.C. § 4 requires the government to establish: (1) the commission and completion of a felony by a third party, (2) the defendant's knowledge of the felony, (3) the defendant's failure to notify the authorities, and (4) that the defendant took an affirmative step to conceal the crime. *United States v. Ciambrone*, 750 F.2d 1416, 1417 (9th Cir. 1985).

The crime here was Greybull's fraudulent use of nominee borrowers. There was evidence, however, that White Eagle knew of the fraud: Christiansen told White Eagle that the loans in her name and Greybull's son's name actually belonged to Greybull, and that the loans needed to be paid out of Greybull's life insurance policy. White Eagle never notified relevant authorities of Greybull's use of nominee

borrowers, and concealed Greybull's fraud by arranging for Greybull's husband to pay off the long-term loans with life insurance proceeds to head off any investigation into the matter.

As with the bribery charge, White Eagle argues that there was no concealment and claims that she reported the crime by notifying Darryl LaCounte, the relevant BIA official, that Greybull's husband had paid the balance of a loan for one of Greybull's relatives. This report was insufficient because the law requires the reporting of the "commission of a felony," not just related acts. *See* 18 U.S.C. § 4 ("Whoever, having knowledge of . . . *a felony* . . . does not as soon as possible *make known the same*" may be subject to penalties.) (emphasis added). LaCounte also testified to the contrary, and the jury was entitled to reject White Eagle's story to the extent that it conflicted with LaCounte's. *See Yossunthorn*, 167 F.3d at 1270 (a jury's credibility finding cannot be reviewed on appeal).

White Eagle additionally claims that she took no affirmative step to conceal the crime because the payment of Christiansen and Greybull III's loans did not make it any harder for the government to uncover Greybull's fraud. However, the jury heard testimony from the tribe's chief financial officer that her audit focused primarily on loan payments, not their origination. Because this evidence showed that paid off loans were less likely to be investigated, the jury could conclude that payment of the loans made the discovery of the fraud less likely and, therefore, that White Eagle took an affirmative step to conceal the felony.

White Eagle finally argues that her conviction cannot stand because there was no underlying prosecution relating to

the long-term loans that Greybull's husband paid and that she allegedly concealed. We have never required evidence of a prosecution or conviction for the third party's offense as a prerequisite for a misprision conviction—only the completion of the offense. *See Ciambrone*, 750 F.2d at 1417 (listing commission and completion of a felony, but not conviction, as elements of the offense); *United States v. King*, 402 F.2d 694, 695 (9th Cir. 1968) (holding, without discussing prosecution or conviction of the principals, that sufficient evidence supported the jury's finding that the principals committed a felony). Any other conclusion could bar prosecution in cases like this, where the third party dies or for other reasons is not charged and/or convicted before the defendant is tried. Reversal of Count VI on these grounds is not warranted, and we affirm White Eagle's conviction on Count VI.

## F.  White Eagle's Fifth Amendment Defense

White Eagle also argues that convictions for Counts V (public acts affecting a financial interest) and VI (misprision of a felony) would violate her Fifth Amendment right to avoid self-incrimination because each charge relied on her duty to report criminal activity that would have exposed her to prosecution. However, these convictions were based on White Eagle's failure to report *Greybull's* crimes, not her own alleged criminal activity. The connection between White Eagle's loan modification and Greybull's use of nominee borrowers is too remote to implicate White Eagle's Fifth Amendment rights.

White Eagle cites to persuasive authority that a misprision conviction cannot stand where the defendant's duty to report would have furnished evidence against the defendant.

Notably, these cases arise where the defendants' criminal activity arose out of the same transactions that constituted the felonies they were obligated to report. *See King*, 402 F.2d at 697 (defendant who was present at meetings of conspirators before and after bank robbery, received some proceeds from it, and helped participants leave town could not be prosecuted for failure to report robbery); *United States v. Kuh*, 541 F.2d 672, 677 (7th Cir. 1976) (prosecution for misprision violated Fifth Amendment because the defendant's duty to report armored car robbery would have revealed his receipt and possession of money stolen in that same crime). In contrast, White Eagle's liability for her allegedly criminal activity—receipt of the loan modification—was not directly connected to the criminal activity she failed to report, Greybull's use of nominee borrowers.

White Eagle's invocation of the Fifth Amendment is insufficient because her disclosure of Greybull's scheme would not have provided a strong enough "link in the chain of evidence needed to prosecute" her for her own misdeeds. *Cf. King*, 402 F.2d at 697 (Fifth Amendment protections apply where the "individual has reasonable cause to fear he might . . . be convicted" because of the information he reveals.). It is true, as White Eagle argues, that the disclosure of Greybull's fraud might have led to an audit that might have exposed other frauds, which might in turn have implicated White Eagle. However, as the government points out, Menz's complaint had already triggered an OIG investigation, but no extensive audit, so discovery was by no means assured even if White Eagle had reported Greybull's activity. Because the connection between disclosure and prosecution was tenuous and speculative, no Fifth Amendment violation arises out of White Eagle's convictions on Counts V and VI.

## II. SENTENCING

We review de novo the district court's interpretation of the Sentencing Guidelines, its application of the Guidelines to the facts for abuse of discretion, and its factual findings for clear error. *United States v. Loew*, 593 F.3d 1136, 1139 (9th Cir. 2010).

The district court correctly set White Eagle's base offense level at 14, as she was a public official within the meaning of the law. *See* U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2C1.1(a)(1) (Nov. 2012); 18 U.S.C. § 201(a)(1). However, the district court appears to have erred in the next step: adjusting the sentence based on "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained . . . , or the loss to the government from the offense, whichever is greatest." U.S.S.G. § 2C1.1(b)(2). The district court appropriately looked to the loan modification, but simply recited the Guidelines language before concluding that "the value is the $15,000 loan" and making adjustments to that figure based on White Eagle's payments. While the district court's cryptic statement gives little insight into its methodology, it appears that it valued the loan modification using standard "loss" calculations instead of focusing on the "value of the benefit" White Eagle received as the Guidelines require.

Given our reversal of the conversion and misapplication conviction, there is no $15,000 "loss" to the government that could be used as the basis for the sentencing adjustment. Nor is there any evidence that White Eagle's loan modification was fraudulently obtained such that its entire amount could be considered a loss under § 2B1.1, which governs loss

calculations for financial crimes based in fraud and other forms of theft. *See* U.S.S.G. § 2B1.1, introductory cmt. (noting that § 2B1.1 addresses "basic forms of property offenses [like] theft, embezzlement, fraud, forgery, counterfeiting"). Any sentencing adjustment must therefore be based on the value of the loan modification as a bribe.

Section 2C1.1, which governs valuation, does not contemplate using § 2B1.1 to determine the "value of the benefit received or to be received" in a bribery conviction. U.S.S.G. § 2C1.1, cmt. n.3 (stating that "'*[l]oss*,' for purposes of [§ 2C1.1(b)(2)], shall be determined in accordance with" § 2B1.1, but separately discussing the *value* of the benefit or payment) (emphasis added). Where, as here, there is no loss, or the loss is not the largest of the listed values, § 2B1.1 becomes relevant only *after* the value of the benefit or payment is otherwise determined. *See* U.S.S.G. § 2C1.1(b)(2) ("If the value of the payment [or] the benefit . . . exceeded $5,000, increase by the number of levels from the table in § 2B1.1."). The district court therefore erred to the extent it relied on § 2B1.1's methodology for valuation purposes.

The district court also erred in equating the value of the loan modification to a cash payment of the same size. "The value of a transaction is often quite different than the face amount of that transaction." *United States v. Fitzhugh*, 78 F.3d 1326, 1331 (8th Cir. 1996). The *Fitzhugh* court looked to § 2C1.1 for guidance in a commercial bribery matter governed by § 2B4.1 and concluded that "[w]hen a loan is obtained by bribes, it is likely to be at favorable terms, in which case its value will typically be the difference between the actual cost of the loan, and the cost of the same loan at fair market terms and conditions." *Id.* This

conclusion follows from § 2C1.1's mandate to focus on the net value of "'the benefit received or to be received.'" U.S.S.G. § 2C1.1, cmt. n.3 (noting that where a contract is awarded in exchange for a bribe, the "benefit" from the contract is the profit made thereon, not the entire payment due under the contract).

The Eighth Circuit's *Fitzhugh* decision is instructive here because White Eagle was not bribed with a loan she was not expected to repay. Instead, she received an expedited loan that appears to have issued on better terms than standard Credit Program loans. It is unclear, however, whether White Eagle would have received the loan at all absent Greybull's intervention. Both of those issues can factor in to the ultimate valuation of the net benefit conferred on White Eagle by the loan modification. We are not in a position to dictate the precise valuation methodology on appeal. Instead, because the district court rested its valuation decision on the face value of the loan and did not link its calculations to the "value of the benefit [White Eagle] received," we remand for further proceedings consistent with this opinion. U.S.S.G. § 2C1.1, cmt. n.3; *see also Fitzhugh*, 78 F.3d at 1331 (finding that "the scanty evidence of record regarding the [favorable] loan . . . suggests that its value, properly calculated, would be far less than its face amount" and remanding for a correct determination of its value).

## CONCLUSION

White Eagle's convictions on Counts I, II, IV, and V are **REVERSED**. Her convictions on Counts III and VI are **AFFIRMED**. The matter is **REMANDED** to the district court for further sentencing proceedings consistent with this opinion.